**STATE of Missouri, Plaintiff–Respondent,**

v.

**Matthew PUCHTA, Defendant–Appellant.**

No. 56248.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 6, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 7, 1990.

William L. Webster, Atty. Gen., Ronald L. Jurgeson, Asst. Atty. Gen., Jefferson City, for defendant-appellant.

Rosecan, Kimbrell & Myers, Alan G. Kimbrell, St. Louis, for plaintiff-respondent.

KAROHL, Judge.

Defendant challenges sufficiency of evidence to support guilty verdicts on three charges of neglect of three nursing home patients, felonies defined in § 198.070.11 RSMo 1986. Defendant was sentenced to pay fines on each charge and concurrent prison sentences on two charges.

Defendant was the administrator of Mercy Convalescent Center from October 17, 1982 until he was discharged on August 16, 1986. His college training was as a business student. He had no medical or nursing training.

Mercy Convalescent Center is located in the City of St. Louis. It is an intermediate care facility as defined in § 198.006(8) RSMo 1986. Residents are housed on the top six of seven floors. It has a capacity of 254 patients.

The grand jury indicted James Schmidt [owner], Matthew Puchta [administrator], Lily Tiller [director of Nursing], and Alice Brown [Assistant Director of Nursing] charging they committed the class D felony of neglect of a resident of a facility because they: (1) "knowingly neglected Mardell Ogle," between August 1, 1986 and August 18, 1986, Count I; (2) "knowingly neglected Patty Herosy," between January 1, 1985 and July 29, 1986, Count II; and, (3) "knowingly neglected Dotsey Nelson," between April 1, 1986 and May 4, 1986, Count III. [Dotsey sometimes also spelled Dotsy]. In response to a motion for bill of particulars the state filed the following response which constitutes the pleadings on which the case was tried:

The State hereby incorporates by all counts, charges, allegations, writings, and endorsements contained in the indictment heretofore filed in the above entitled cause.

As to Count One: Defendant knowingly neglected Mardell Ogle who was at that time a resident of the Mercy Convalescent Center, a facility as defined in Chapter 198 RSMo., in that said defendant failed to provide reasonable and necessary services to insure adequate treatment and maintenance of a halo brace and to prevent and treat infection on the body of Mardell Ogle at the pin sites of the halo brace and to prevent loosening of the halo brace on the body of said Mardell Ogle which presented an imminent danger to the health, safety or welfare of said Mardell Ogle.

As to Count Two: Defendant knowingly neglected Patty Herosy who was at that time a resident of the Mercy Convalescent Center, a facility defined in Chapter 198 RSMo, in that said defendent [sic] failed to provide reasonable and necessary services to insure adequate nutrition and hydration of Patty Herosy and to prevent and treat decubitus ulcers on

the body of said Patty Herosy which presented an imminent danger to the health, safety, or welfare of said Patty Herosy.

As to Count Three: Defendant knowingly neglected Dotsy Nelson who was at that time a resident of Mercy Convalescent Center, a facility as defined in Chapter 198 RSMo., in that said defendant failed to provide reasonable and necessary services to insure adequate supervision and maintenance of the body of Dotsy Nelson while restrained and failed to monitor said restraints on the body of Dotsy Nelson or provide adequate monitoring or supervision of said restraints which presented an imminent danger to the health, safety, or welfare of said Dotsy Nelson.

"The state must establish every element of the offense charged by substantial evidence ... We of course consider the evidence from the state's vantage point without reweighing and give the state the benefit of all reasonable inferences." *State v. Dale,* 775 S.W.2d 126, 133 (Mo. banc 1989); *State v. Brown,* 660 S.W.2d 694, 698 (Mo. banc 1983). It is for the trier of fact to determine beyond a reasonable doubt whether the defendant was guilty of the offense charged. *State v. Brown,* 660 S.W.2d at 698. Our review is therefore limited to determining whether the evidence is sufficient to support the verdict. *State v. Rodden,* 728 S.W.2d 212, 213 (Mo. banc 1987). In making this decision we must accept as true all legally admitted, probative evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. *State v. Brown,* 660 S.W.2d at 699.

Defendant was convicted of three counts of knowing neglect of a resident. Section 198.070.11 RSMo 1986 provides:

11. Any person who knowingly abuses or neglects a resident of a facility shall be guilty of a class D felony.

The indictment and bill of particulars do not charge abuse. Defendant is charged with neglect, as defined in § 198.006(11):

The failure to provide, by those responsible for the care, custody and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result;

The Supreme Court recently determined in *State v. Dale,* 775 S.W.2d at 133, "§ 198.070.11 is violated only if Class I violations are shown." Class I violations are defined in § 198.050.1(1) RSMo 1986 as those which present an imminent danger to health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result.

The state must prove that defendant acted "knowingly" with respect to the counts on which he was convicted as that term is defined in § 562.016.3 RSMo 1986. Proof of supervisory authority is not sufficient to convict. *State v. Dale,* 775 S.W.2d at 133.

■ The state bore the burden of proving: (1) neglect as defined in § 198.006(11) RSMo 1986; (2) defendant acted "knowingly" as that term is defined in § 562.016.3 RSMo 1986; (3) acts for which defendant is criminally liable presented imminent danger to the health, safety or welfare of a resident or substantial probability of death or serious physical harm; and, (4) defendant acted with a co-defendant with a common purpose to neglect a resident, or, he acted or encouraged others to neglect a resident. Within the framework of the noted principles and rules of review we consider defendant's claim of absence of sufficient proof to support a verdict on each count.

### Count I—Mardell Ogle

Mardell Ogle, age 63, testified for the state. She was a resident of Mercy from August 1, 1986 to August 18, 1986. Prior to admission she was treated at St. Louis University Hospital for a "cracked vertebrae" sustained in a fall at her home. Dr. Kraft prescribed a halo brace which was installed on June 24, 1986. Four metal pins pierced the skin and attached the halo brace to the outer table of the skullbone.

The device included a vest secured at the waist and shoulders. It weighed eight and one half pounds. Dr. Kraft testified patients wearing halo braces frequently return home, but Ogle lived alone, had a history of cerebral palsy, and had a balance problem causing several recent falls.

Ogle was transferred to Bethesda Hospital on June 26, 1986. Nurse Moore saw her there on August 1, 1986. Moore testified she saw no infection of the pin sites at this time. Later that day Ogle was transferred to Mercy.

Ogle testified her legs were "weakening" on her and the halo made it difficult to get out of bed. She insisted she did not suffer from cerebral palsy, and she was at Bethesda for therapy. Ogle testified that a woman named Minnie [Minnie Conwell], who worked days, treated the pin sites at Mercy—"[s]he'd take each pin site and do something to it." The halo worked loose one Saturday night, she could not remember the date, and the next morning there was blood on her forehead. She couldn't remember who, besides Minnie, helped her at Mercy. She bumped her head once or perhaps several times while alone in the bathroom, and she was not always helped as needed. Ogle was permitted to testify, over objection, she never had enough to eat and there were bad odors at Mercy.

The evidence of neglect of Mardell Ogle, summarized from the state's perspective, is best understood by noting evidence of her condition, diagnosis and treatment at St. Louis University Hospital when she returned there by ambulance on August 18, 1986.

Dr. Robert Esterl saw Ogle on August 18, 1986 in the St. Louis University Hospital emergency room. Dr. Esterl and Nurse Moore treated Ogle by replacing the halo brace with a Philadelphia collar in order to give the head a rest because it was infected. The infection was cleared sufficiently to install a new brace on August 27, 1986.

Dr. Esterl described his emergency room observations of August, 1986. He stated the right frontal pin of the halo had come out; the skin beneath that pin had almost closed over; the left frontal pin had some bloody drainage from the skin site and dead tissue surrounding the pin cite, with some evidence of healing; the other two [back] pin sites had swelling about them and a small amount of greenish drainage; because the right frontal pin was out and the halo itself was askew, in a cocked position. The vest was somewhat filthy. Dr. Esterl opined that there is a danger to the patient where the halo was in a cocked position because the cervical spine would not heal in the correct position. He believed the healing tissue probably took several days to overgrow, "[i]t would probably take five to seven days for pins in this fashion to be so infected." The following hypothetical question and answer are significant:

Q. And, Doctor, if a patient were receiving cleansing of the pin sites *three* times a day with either Betadine or with normal saline, a combination of normal saline and peroxide solutions, do you have an opinion within a reasonable degree of medical certainty as to whether the infections that you saw on this woman's head on August 18th would have occurred? Did you follow my question?

A. I believe so. If the pins are adequately cleaned with the half strength hydrogen peroxide or Betadine ointment as we routinely recommend, *which is three times a day*, these agents are effective enough to usually control this—to control the organisms that cause these types of wound infections. [Our emphasis].

This answer is significant because of Dr. Kraft's opinion that "[i]t's not likely that the pins were cleansed as ordered three times a day." State's evidence proved cleansing was ordered "b.i.d.," two times per day.

On cross-examination Dr. Kraft testified it was not his opinion the pin sites were not cleaned at all, only that they were not cleaned with Betadine or hydrogen peroxide three times a day. He testified that "even with the best of care, pin sites do become infected sometimes." He also testified he was unaware Ogle had previously testified she bumped her halo and her head

started bleeding. He admitted this testimony would affect his opinion. He was also unaware Ogle testified that Minnie Conwell swabbed these pin sites every morning.

Nurse Moore testified she was present when the halo was applied on June 24, 1986. She was a St. Louis University Hospital nurse, but saw Ogle at Bethesda "about twice." Preparing for Ogle's transfer to Mercy she checked the halo, the vest, tightened all the bolts and saw no problem with the pins. She helped prepare a transfer note directing application of Betadine and/or hydrogen peroxide around the pin sites three times a day, and inspection of the pin sites for infection. She prepared a patient transfer sheet which she testified should go with the patient. According to Moore, patients can go home and clean the pin sites themselves while wearing the device, but Ogle did not return home because she was unsteady on her feet and had a history of cerebral palsy.

Nurse Moore saw Ogle at St. Louis University Hospital on August 18, 1986. Moore observed the halo ring was completely cocked; the right frontal pin was completely out of place; the skin underneath was black and beginning to heal over; and, the skin was very infected.

On cross-examination Nurse Moore identified state's Exhibit 1–B which contained instructions that the pin sites be Betadine swabbed "b.i.d.," which means twice a day. Donna Fisher, an employee of the Missouri Division of Aging, testified Ogle's resident records at Mercy, state's Exhibit 1, contained signed doctor's orders for Betadine treatments *twice* per day. These records refer to notice given Dr. Solner about the bleeding the weekend Ogle bumped the halo.

Dr. Kraft subsequently testified that in his opinion "her condition on August 18th and the condition of the brace, and that's 1986, represented a substantial probability that serious physical harm would come to Ms. Ogle or death." He explained that an infection which progresses can eventually become septic and cause shock. He stated this is far more likely to cause physical harm than death. Dr. Kraft opined that it is "unlikely" the pin sites were properly swabbed and he could "say absolutely given the degree of infection, I believe it would have had to have been infected enough to require additional care at least three or four days earlier." He explained additional care meant "observation of it, whether from the staff physician or calling us, in which case the one or more of the pins probably would have been removed at that time and antibiotics started." He *confined* his opinions to swabbing *three* times a day. He noted the Bethesda General Hospital transfer form regarding Ogle required swabbing twice a day.

Susan O'Shaughnessy, Assistant Director for Social Services at St. Louis University Hospital, testified she made a "hotline" call after seeing Ogle in the hospital emergency room on August 18, 1986. Prior to the report she talked to Dr. Esterl, Nurse Moore, Dr. Kraft and Ogle.

Patricia Harris, a licensed practical nurse, testified for the state. Harris worked at Mercy from September, 1985 to September, 1986 and participated in Ogle's admission. She testified that Ogle was admitted with transfer orders from Bethesda. Harris read state's Exhibit 6–A, a photocopy of a transfer sheet, to the jury. It described numerous medications, but did not mention Betadine swabs. Harris then identified state's Exhibit 1–A and stated 1–A is just like 6–A "except it has Betadine at the beginning of the drugs. Betadine swabs to pin sites b.i.d. [twice a day] which is not the original order." Harris testified, "[t]here was no order for Betadine." On cross-examination Harris was asked, "[a]re you telling me that by your recollection, Bethesda sent Miss Ogle there with this halo on with no orders to [sic] anything to treat the halo?" She answered, "Not on that transfer sheet." A doctor saw Ogle on August 7, 1986. Miss Harris claimed that the addition of Betadine treatment on state's Exhibit 1–A was a "forgery."

Minnie Conwell, a certified medical technician at Mercy for eight years, testified for the state. Conwell's duties included charting medications for residents and

writing monthly summaries and nursing assessment sheets. She testified Ogle told her how to treat the brace, "how they had done it in the hospital and everything." She learned how from the transfer paper from the hospital, "it had an order on it for Betadine swabs around the area, *and that's what we did.*" Conwell testified she prepared state's Exhibit 1–I which bears the date 8–1–86. She signed the form. It was the first nursing note for Ogle. She did not note Betadine treatment to pin sites twice a day. She drew a halo on the form. She did not recognize state's Exhibit 1–B, an unsigned sheet referring to "Betadine to wound clamps only." She was directly asked "okay, Miss Conwell did you treat Mardell Ogle?" Her answer was, "Yes." "And how did you treat Mardell Ogle?" Her answer was, "[w]ith the Betadine swab." This treatment was during the day shift, five days a week. She was off Saturday and Sunday. She returned on Monday, August 18, 1986, the day Ogle was transferred to St. Louis University Hospital. Miss Conwell observed "the screws had come out of her intack, and it was bleeding real bad, and it had began [sic] to go making another hole in her skull." There was no bleeding before the weekend.

On cross-examination Conwell testified that when she arrived in the morning she regularly saw Betadine stains on Ogle's pillow, and signs on the pin sites that someone else had also applied Betadine to the wounds. She noted instructions from state's Exhibit 1–L for Betadine swabs to pin sites "b.i.d." Mercy's normal routine was to administer b.i.d. treatments morning and evening. The notations on the exhibits were in Conwell's handwriting.

On redirect examination the state questioned Conwell about the absence of treatment records for Ogle. Conwell responded that she made the treatment sheet when Ogle came in and she knew Ogle had a treatment sheet. "I know that the treatment was done, and we had a treatment sheet, and it's not here. It's missing." On recross-examination she emphasized that she prepared a treatment sheet for Ogle and had no idea what happened to it. Further, on Friday before the weekend Ogle bumped the halo and bled, there was no infection, swelling, redness or bleeding. Finally, Conwell testified that Ogle told her "she had fell [sic] during that night. Out of bed."

Stella Green, a certified medical technician testified for the state. She was employed at Mercy for ten years. She testified: she treated Ogle with sterile swabs with Betadine solution; she charted the treatments every day; and, she first saw bleeding on Saturday, August 16th and charted that observation. She reviewed state's Exhibit 1 and found no treatment sheet. However, she reaffirmed that she treated Ogle and charted the treatments. She testified the nurses' notes for Ogle were not in the file. She testified Ogle was fine on the Saturday before she was transferred to the hospital. Finally, she testified a shortage of help did not stop swabbing of pin sites. There was considerable evidence of problems of employee shortage but none that regulations of minimum numbers were violated.

Because the state argues there is evidence from which the jury could infer defendant was aware that Mercy "could not adequately care for Ms. Ogle" and "this alone is sufficient to submit Count One to the jury" we note that evidence. Co-defendant, Alice Brown, testified that when Ogle was admitted she had a meeting with defendant and Lily Tiller. At the time Brown said "we shouldn't admit the lady with the halo." When asked, "why not?" she responded "[b]ecause we have, you know, two hundred fifty residents that our census carry, and *we didn't need* anyone that took any special treatments to add to it." (Our emphasis). From this testimony the state concludes that it was Brown's opinion that Ogle's special needs *could* not be met by Mercy. Obviously, the contention that defendant was aware that Mercy could not care for Ogle and, therefore, by admitting her, neglect was certain to happen, is unsupported by the evidence relied on by the state. The comment of Brown relates to the needs of Mercy, not the needs of Ogle. There is no direct evidence to support an inference that Ogle's needs could not be

met at Mercy. Her needs required only infection control and monitoring a stable halo, conditions which most patients are able to do for themselves according to the testimony of Dr. Kraft.

The state offered the resident file of Ogle as Exhibit 1. There are no nurses' notes or other records to support employee testimony that all Betadine treatments were given at least twice a day. The absence of such records would support an inference that the treatments were not done if the records were complete. However, various state witnesses testified the treatments were done and properly charted but the records of treatment were absent from the file.

Donna Fisher, an institutional advisory nurse with the Missouri Division of Aging, testified she reviewed records at Mercy regarding the three patients who are subjects of the three charges. She went there in October, 1986, several months after Mercy discharged defendant. She testified that all pertinent documentation to a resident's plan of care and all necessary things being done for that resident, would be placed in the patient's file. It would not be a rules violation if some materials were kept in a separate file. State's witness Conwell testified there were treatment sheets for Ogle that were missing from the file brought to court. Testimony revealed records for residents were found in the basement of Mercy Convalescent Center which were not in the resident file. The prosecuting attorney acknowledged this evidence and told the court outside the hearing of the jury, "I think that's clear from the testimony that documents are misplaced." In view of this evidence there can be no inference of failure to treat because of incomplete patient records.

█ We conclude the evidence, taken in the light most favorable to the prosecution, together with available inferences, failed to support submission on Count I. The evidence is that twice a day treatment was ordered by Ogle's doctor. There is no evidence that the pin sites were not swabbed twice a day with Betadine, or that any employee of Mercy was ever told a mini-

mum of three treatments per day were required. The state offered a variety of evidence, particularly doctor's orders, that infection prevention treatments were to be given twice per day. This evidence undermines the expert testimony of neglect for failure to treat three times per day. There is no evidence that any act or failure to act by any Mercy employee caused the halo to become dislodged and, therefore, caused imminent danger to the health, safety or welfare of Mardell Ogle. The fact that an infection did occur is not probative of neglect in light of the testimony of Dr. Kraft. On the contrary, the state's evidence proved Betadine treatments were ordered administered twice a day and the halo was displaced by an act of Mardell Ogle. Additionally, there is no testimony that defendant or co-defendants, Schmidt, Tiller or Brown ever learned of the dislocation of the halo before Ogle returned to St. Louis University Hospital. Under those circumstances the displacement of the halo is totally irrelevant to the charge of neglect unless Mercy Convalescent Center was wholly unprepared to accept patients with a halo. The latter contention is wholly unsupported by the evidence.

### Count II—Patty Herosy

Defendant is charged with neglect of resident Patty Herosy for failure to provide reasonable and necessary services to insure adequate nutrition and hydration and with failure to prevent and treat decubitus ulcers [decubs] which presented an imminent danger to her health, safety, or welfare. Herosy became a resident of Mercy on March 30, 1984. She transferred from Mercy to Incarnate Word Hospital on July 29, 1986 where she died on August 22, 1986 at age 79.

The charge alleges neglect between January 1, 1985 and July 29, 1986. According to state regulations a nursing home resident is entitled to select her own physician. Patty Herosy, or her guardian, the Public Administrator for the City of St. Louis, chose Dr. David Rosenburg as her physician. The doctor's diagnosis of her maladies on January 15, 1985 contained the fol-

lowing: organic brain syndrome, atherosclerotic heart disease, cancer of the colon, Parkinson's disease, degenerative joint disease, anemia, and malnutrition. The doctor's diagnosis of her condition on February 11, 1986 was substantially the same. There is an abundance of evidence that her physical condition deteriorated beginning no later than April 25, 1986.

An analysis of the evidence of neglect begins with a description of her condition when admitted to Incarnate Word Hospital on July 29, 1986. The admitting diagnosis was "cyanosis/dementia/metastatic cancer." In the emergency room a nurse noted:

> History three days extremities turning blue. Presents today hands and feet blue. Generalized echymosis and petechiae [pin size hemorrhagic spots in the skin] over most skin areas covering 75% skin. Crusher ulcers right shoulder [and] coccyx with drainage patient non verbal pulse irregular and radial pulses very weak and pedal pulses. Emaciated, dehydrated. History of organic brain syndrome, atherosclerotic heart disease, cancer of the colon, degenerative joint disease.

Dr. Kosuri, attending physician at Incarnate Word, saw Herosy on July 30, 1986. She observed the patient to be:

> ... an elderly white female who was thin, emaciated ... She was not responsive to questions, but she was responsive to touch and pain ... her skin was dry ... She had one [decubitus area] on her right shoulder and one on her sacral area. And she had superficial abrasions and ecchymotic area about extremities. She had dehydration ... she had fecal impaction ... [a] history of atherosclerotic heart disease. And a history of carcinoma of the colon.

Dr. Kosuri noted at time of admission Herosy's weight was 55 pounds. A nursing admission assessment listed her bed weight as 50.4 pounds. On admission the doctor noted the decub on the shoulder to be blue to black, about ten centimeters long and a decub in the sacral area three to four centimeters. There can be no doubt that at the time of admission to Incarnate Word Hospital, Patty Herosy was dehydrated, undernourished, and had two decubs. She also had bruises on her left arm, her left leg by the knee, and on her feet. She had long unclipped toenails.

Herosy was treated, fed intravenously and was force fed other fluids at the hospital. On this regimen she gained roughly ten pounds. However, she acquired bilateral pneumonia and a urinary tract infection and died on August 22, 1986. The causes of death were listed as: "[b]ilateral pneumonia, dehydration, decubitus ulcers."

The state contends it made a submissible case on the charges. Its analysis begins by noting proof of several decubs and appearance of dehydration. It then relies on the testimony of Dr. Ubado Rodriguez, a doctor who practiced at Incarnate Word Hospital. On August 5, 1986 he was called by Dr. Kosuri to see Herosy for examination of an ulcer. He noted decubitus ulcers of the sacral area and of the right shoulder. He also noted severe malnutrition. The shoulder decub was ten centimeters long with approximately three to four centimeters of necrotic [dead skin], scar-like tissues in the center of the shoulder. The decub in the sacral area was three to four centimeters in size. He prescribed medication for the sacral decub and plastic surgery for the shoulder decub. He opined that a skinny and malnourished person would form a decub faster than someone who is healthy and not malnourished. Generally, decubs are secondary to pressure.

Dr. Kosuri, a physician practicing at Incarnate Word Hospital testified for the state. She observed Herosy to be a thin, emaciated white female. She noticed the two decubs. She contacted Mercy and spoke with someone on the nursing staff in order to acquire information relevant to Herosy's treatment. She received from Mercy some information noted on the admission diagnosis. Dr. Kosuri saw Herosy daily while she was at the hospital. She requested assistance from Dr. Rodriguez because she was not a specialist in the care of decubs. She described measures available to prevent or relieve decubs, "egg

crates," a special type of mattress, as an example. Dr. Kosuri did not believe that Herosy was in need of skilled nursing care when she first saw her. She could not determine how bruises may have occurred on the patient.

Neither Dr. Rodriguez nor Dr. Kosuri were asked to express medical opinions regarding neglect as a cause of any condition they observed. However, the state contends that because there was expert testimony of deterioration caused by constant pressure on a particular area as a cause of decubs "[a] reasonable inference can certainly be drawn, then, that this victim, noting the degree of formation of the ulcers, had been neglected during her stay at Mercy." The state continues the argument by noting that one of the causes of death was "decubitus ulcers" and there was evidence of staff shortages and shortages of proper equipment to care for Herosy at Mercy. Finally, the state contends evidence of prior decubitus conditions of residents at Mercy was sufficient to show knowledge of the danger of poor skin care, particularly of a dehydrated resident. This, the state contends, supports an inference that defendant purposefully promoted the neglect charged because Patty Herosy was allowed to sustain dehydration and decubitus ulcers.

Defendant concedes evidence of emaciation and dehydration. He responds, however, that the state's evidence included a 1985 and 1986 diagnosis of many illnesses and medical problems, including a chronic condition of malnutrition. He then analyzes all of the state's evidence and argues that the evidence and inferences from the evidence do not establish that the conditions of malnutrition and dehydration were the result of neglect, as charged. In summary, defendant argues, in the absence of medical testimony, the conditions were as likely, or more likely, the result of her illnesses and a general deterioration of health than caused by neglect. In that event the existence of the conditions alone is insufficient to support the charge. Further, there was no evidence adequate food and liquid were ever withheld or not made available for Patty Herosy.

According to the state's evidence Patty Herosy was weighed twice monthly at Mercy. In March, she weighed 75 and 78 pounds, in April, 76 pounds, in May, 70½ pounds, in June, 74 pounds and in July, 73 pounds. There was some evidence that the scale used at Mercy was not always accurate, but there was also evidence that when inaccuracy was noted, repairs were made.

In February, 1986, on physician's orders, food supplements were prescribed. State's witness, Donna Fisher, an employee of the Missouri Division of Aging, testified from medication sheets for March, April, May, June and July, 1986 which show that "hi cal & protein supplement" and "bran" supplement were given daily during those months. The records also disclosed that 4.5 grams of sodium-large portions were included in the April, May, and July diet. A puree diet was ordered on July 28, 1986 and began on July 29. Various nursing notes for 1986 indicate that Herosy partially fed herself, but was assisted. She was a slow eater and had difficulty swallowing. On July 26, 1986 she refused an evening meal. During June and July she suffered from bowel impaction problems which required special treatment. Constipation became a problem on or before May 2, 1986. A record of this condition appears in nurses' notes on May 15, July 11, July 12, July 13 and July 27 as well as when Herosy was admitted to Incarnate Word Hospital.

With regard to the decubitus ulcer problem the state's evidence includes a nursing note on July 26, 1986 concerning an "open area on coccyx two centimeters found" and a large black necrotic area measuring one and one half centimeters on the right shoulder. The supervisor was informed of these decubs. On subsequent dates dressings were applied and the doctor notified. Dr. Struple, acting for Dr. Rosenburg, prescribed warm pads and granular spray to the right shoulder and coccyx areas. There was no evidence that Herosy was not furnished an egg crate mattress, a recognized aid in the prevention of decubs. State's witness Ardrienne Akinson, an employee of Mercy testified that egg crate mattresses were used at Mercy in 1985 and 1986.

There was evidence that the nursing staff at Mercy had several mandatory training programs, including a film, on the prevention and treatment of decubs.

█ In the absence of expert testimony that the conditions of dehydration or malnutrition were the result of neglect and not the result of medical conditions attributable to other diagnosed conditions, we find the state failed to make a submissible case of neglect on this part of the charge in Count II. Existence of a dehydrated or malnourished condition is insufficient to prove neglect in a case where the resident suffered many medical problems, her chosen physician was aware of the conditions and prescribed for them and those prescriptions were followed. The condition does not prove any particular cause, where several causes are possible. The presence of numerous, severe illnesses could also be the sole cause of the condition. There was no evidence that reasonable efforts to furnish adequate food and fluids were not expended by any employee at Mercy on behalf of Patty Herosy or that food and water was not made available in sufficient quantity.

Instruction No. 7 submitting Count II did not specifically submit nutrition, hydration or decubitus ulcers. Rather, it submitted the issue of neglect in paragraph three as "knowingly failed to provide reasonable and necessary services to maintain the physical and mental health of Patty Herosy." We find this submission unsupported in relation to the charges of adequate nutrition and hydration. Accordingly, it is unnecessary for us to further analyze sufficiency of evidence regarding decubitus ulcers. One comment regarding the ulcers is, however, appropriate. In contrast to the factual evidence in *State v. Dale*, 775 S.W.2d 126, 134, relied on by state, the general evidence of shortages in dressings and personnel at Mercy was not specifically related to Patty Herosy and the coccyx ulcer was a first stage ulcer, not one found to be healing and allowed to progress to a fourth stage as proven in *Dale*. In addition, the condition of the ulcers was noted in the resident records, there was a prescription for care of the ulcers by the resi-

dent's own doctor, and they were not so severe as to require skilled nursing care when seen by Dr. Kosuri in early August, 1986.

### Count III—Dotsey Nelson

The state charged neglect of Dotsey Nelson for failure to provide reasonable and necessary services to insure adequate supervision and maintenance of the body of Dotsey Nelson while restrained and failed to monitor said restraint or provide adequate monitoring or supervision of said restraints which presented an imminent danger to health, safety and welfare.

Nelson was a resident of Mercy from 1985 until his death on May 4, 1986. He was described as six foot tall, thin, blond hair, blue eyes and kept a smile on his face. He was restrained by a posey on doctor's orders and such restraints are subject to the regulation and licensing law for the Division of Aging, 1986. That law was presented as an exhibit and accepted into evidence over objection of defendant. Regulation No. 71 provides, "residents requiring restraints shall be checked every thirty minutes and exercised every two hours. Locked restraints shall not be used." There is no issue regarding the need for restraints, prescription for restraints in the daytime or that Nelson was restrained in a chair or loveseat during the day for his protection.

Nelson was restrained by a posey vest around his chest during the afternoon hours of May 4, 1986 in the dayroom located on the third floor. The posey was tied to a three chair bench, sometimes described in the evidence as a loveseat. Approximately 5:10 p.m., Ramonia Agnew, a licensed professional nurse and an employee of Mercy, was summoned by a female voice over an intercom requesting her attendance on the third floor. The person who called for help was present when Agnew came to the dayroom but she could not recall her identity other than she was a certified nurse's aid. The unidentified nurse's aid did not testify at trial. Agnew found Nelson in the dayroom in the restraint. She said Nelson was "cold as a mackerel." She

could not move his limbs because of rigor mortis. Agnew had Nelson removed from the chair and placed in a bed. His pupils were fixed and dilated with no visible signs of life. Agnew then called a doctor.

A number of state's witnesses testified that employees of Mercy were instructed to check restraints each half hour and release restraints every two hours as required by the regulations. There was no evidence any Mercy employees were unaware of the requirement for checking and releasing restrained residents.

Co-defendant and state's witness, Alice Brown testified that Mercy had a problem with restraints in 1985. As a result, defendant Puchta required chairs to be marked with numbers and a sheet prepared that;

> went along with the chairs. On the sheet would be the residents' names that needed to be—that couldn't change their position would be on the sheet. And the sheet was setup to go with the resident in the chair. So every two hours this resident should be—if he's in number two at twelve, he should be in some other number at two.

According to Brown, the chair numbering system caused employees to check some residents [the every half hour requirement] and change others [the two hour requirement]. Brown testified that each resident had a restraint sheet. Nelson's records contained a note dated November 25, 1985 which stated he required a posey restraint in a chair for his safety. Other notations in his records refering to a posey occurred on March 22, 1986 and April 10, 1986.

■ The state does not contend and there was no evidence from which the jury could find Nelson's death was caused by the posey restraint or that the restraint or a failure to check or release the restraint caused or contributed to cause his death.

State's witness, Dr. Philip Burch, Medical Examiner for the City of St. Louis, testified that, in his opinion, "it would take longer than an hour for someone to develop full rigor mortis." There was no recorded evidence as to the last time a proper notation had been made concerning checking or releasing Nelson's restraint. The absence of complete records for residents prevents an inference of neglect regarding restraints for the reasons previously noted in this opinion. There is simply no evidence from which the jury could find when, or if, the restraints on Dotsey Nelson were last checked or released, assuming Dotsey Nelson died at 4:10 p.m., or earlier on May 4, 1986. Agnew's observation that Nelson was "cold as a mackerel," is a less than a scientific medical observation. It is unclear whether this observation was reliable enough to support Dr. Burch's opinion that the degree of rigor mortis indicated death at least one hour before discovery. Dr. Burch did not have all information necessary to determine time of death. He did not know when the body was first found, temperature of the room in which the body was found, and Nelson's state of health at the time of death. He testified all these facts were relevant, none were proven.

The state's undisputed evidence is that restraints required a doctor's prescription and had to be checked every half hour and released every two hours. According to various state witnesses Puchta designed a procedure for ensuring that patients' restraints were checked every half hour and released every two hours. This established procedure was a regular practice prior to and on the day Nelson was found dead.

The charge and bill of particulars on Count III created a burden of proof upon the state that checking and releasing did not occur, a burden not satisfied by the evidence. In addition there is no evidence to support a finding that if some checking or some releasing on the day of death did not occur, this constituted an imminent danger to the health, safety or welfare of Dotsey Nelson. Finally, there is no evidence that defendant or any of the co-defendants "knowingly" acted, or failed to act, with reference to any breach of policy and standard operating procedure, in checking and releasing the restraints of Dotsey Nelson. In summary, the evidence wholly failed to prove the charge made in Count III.

### Conclusion

We find the evidence insufficient to submit Counts I, II and III. Judgments of

conviction and sentences are reversed. It is unnecessary for us to reach many errors claimed and argued by defendant as grounds for a new trial, some of which have merit.

One of appellant's points claimed the court admitted immaterial and irrelevant evidence over timely and proper objections. The trial court acknowledged on the record:

I have let a lot of what this court initially felt and still feels is immaterial and irrelevant evidence and almost to the point that in this court's opinion, that I probably have created a record so full of error that no matter what the verdict is in this case, I probably will be reversed.

■ Defendant claims the court erred in permitting the state, over timely objection, to identify Alice Brown as an indicted co-defendant who would testify in return for a plea bargain. The court denied motions for mistrial based on this characterization during voir dire and the state's opening statement. This was particularly poisonous because in so identifying Brown, the prosecuting attorney did not inform the jury the plea was to an amended single charge, a misdemeanor, not to the charge that she knowingly neglected any resident. This wholly unjustified strategy may very well have served to withdraw the issue of neglect by Brown and defendant and misled the jury into believing it had to decide only whether defendant aided or acted together with Brown. Brown's plea was both hearsay and violated defendant's right of confrontation. It was held in *State v. Fenton,* 499 S.W.2d 813, 816 (Mo.App.1973) a judgment of conviction against one person jointly indicted with another is not competent on the trial of the other and "[t]he same rule is applicable where two persons are jointly charged and one pleads guilty."

Reversed.

PUDLOWSKI, P.J., and CRANDALL, J., concur.