**STATE of Missouri, Respondent,**

v.

**Barbara PEOPLES, Appellant.**

**No. WD 52691.**

Missouri Court of Appeals,
Western District.

Feb. 24, 1998.

James F. Crews, Crews & Lutz, Tipton, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before EDWIN H. SMITH, P.J., and BERREY, Senior Judge, and ELLIS, J.

ELLIS, Judge.

Barbara Peoples appeals from the judgment entered on her jury conviction of six counts of neglect of a resident of a nursing care facility, § 198.070.11.[1] Peoples was sentenced to 30 days jail time on Count I, 60 days jail time on Count II, one year imprisonment each on Counts III and IV, and two years imprisonment each on Counts V and VI, all to be served concurrently.

Peoples, a licensed practical nurse, was the Director of Nursing at the Latham Care Center (the Center), an intermediate nursing home or resident care center located in California, Missouri. As the Center's Director, Peoples was responsible for the nursing staff; for assessing and caring for all patients, especially those displaying symptoms of sickness; and for contacting physicians, paramedics and family members when necessary.

On September 13, 1994, 87–year–old Edwin Herman entered the Center for treatment and physical therapy while recuperating from a broken hip. On September 19, 1994, a nurse's aid noticed that Herman barely touched his morning and noon meals, and had vomited what little he had eaten. The aid reported this observation to Peoples. When Melva Anderson, a certified medical

---

1. All statutory references are to RSMo 1994, unless otherwise noted.

technician, reported for her shift at 3:00 p.m. that afternoon, Peoples advised her that Herman had vomited on and off that day. That evening, around 7:00 p.m., Anderson discovered Herman was vomiting a "dark spinach color." At approximately 9:00 p.m. that evening, Anderson reached Peoples and informed her of Herman's condition. Peoples instructed Anderson not to call the doctor and stated that she would call the doctor in the morning.

When Katherine Pingleton came on duty at 11:00 p.m. that evening, she was advised of Herman's condition and told not to contact the doctor. Early on the morning of September 20th, Pingleton tested Herman's vomit for blood and, about 6:45 a.m., reported to Peoples that the test was positive. Peoples indicated that she would call the doctor.

When Anderson reported back to work on the afternoon of the 20th, Peoples advised her that Herman was still vomiting, but that she had not had time to call the doctor. That day, Anderson noted that Herman vomited a "medium amount of brown liquid emesis ... six times, and vomited up all fluids he'[d] taken in." Around 4:00 p.m. that afternoon, Rita Fisher, a certified medical technician and certified nurse's aid, reported for work. During a telephone conversation with Peoples, Fisher mentioned that Herman was still vomiting, and that now it was a "coffee ground" color. Peoples instructed Fisher not to call the doctor that evening, stating that she would take care of it when she came into work the next morning.

When Donna Sanders, a certified nurse's aid, arrived for her shift beginning at 11:00 p.m., Herman was still vomiting. At about 2:00 a.m. on the morning of September 21st, Sanders called Peoples at home to advise her that Herman had vomited a coffee color several times since she arrived for her shift, that he was cold and clammy, that his blood pressure was down, and that his pulse had risen. Peoples advised Sanders to keep Herman comfortable, and that she would tend to him in the morning. Sometime thereafter, Sanders was summoned by two aides to Herman's room, where she found him lying in the doorway in a pool of his own emesis. Sanders immediately telephoned Peoples and ad-

vised her of Herman's condition. Peoples indicated that she would be right in. When Sanders returned to Herman, she was unable to detect any vital signs. Peoples was charged by information with six counts of neglect of a resident of a nursing home facility. Each count of the information charged that Peoples, in violation of § 198.070.11, RSMo, committed the class D felony of Neglect of a Resident of a Nursing Home Facility ... in the county of Moniteau, State of Missouri, in that on or about:

### Count I:

September 19, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide medical care and evaluation of Edwin Herman upon learning at about 9:20 o'clock p.m. that he was vomiting spinach-colored material,

### Count II:

September 20, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide medical care and evaluation of Edwin Herman upon learning at about 6:45 o'clock a.m. that he was vomiting blood,

### Count III:

September 20, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide medical care and evaluation of Edwin Herman upon learning at about early on the 3–11 o'clock p.m. shift that he was vomiting repeatedly,

### Count IV:

September 20, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide emergency medical care and evaluation of Edwin Herman upon being informed at about later in the 3–11 o'clock p.m. shift that he was vomiting emesis that looked like "coffee grounds",

#### Count V:

September 21, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide emergency medical care and evaluation of Edwin Herman upon learning at about 2:00 o'clock a.m. that he was still vomiting and that his pulse had increased his blood pressure had decreased,

#### Count VI:

September 21, 1994, the defendant knowingly neglected Edwin Herman, a resident of an intermediate care facility, by failing to provide emergency medical care, life support and transport of Edwin Herman upon learning at about 4:00 o'clock a.m. that he had collapsed with no vital signs.

Following a jury trial on January 29, 1996, Peoples was convicted on all six counts and sentenced to 30 days jail time on Count I, 60 days jail time on Count II, one year imprisonment each on Counts III and IV, and two years imprisonment each on Counts V and VI, to be served concurrently.

■ Peoples presents three points on appeal. As our resolution of points II and III is dispositive of the appeal, we need not address point I. Peoples' second and third points, although couched in terms of challenges to the verdict directing instructions, actually involve a challenge to the sufficiency of the evidence to support her conviction on the six counts of neglect. In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State, including all favorable inferences reasonably drawn therefrom, and disregard all contrary evidence and inferences. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). The State is compelled to establish every element of the offense charged by substantial evidence. *State v. Dale*, 775 S.W.2d 126, 133 (Mo. banc 1989). "Substantial evidence is

competent evidence from which a trier of fact can reasonably decide the case." *Breckenridge v. Meierhoffer–Fleeman Funeral Home, Inc.*, 941 S.W.2d 609, 611 (Mo.App. W.D.1997).

■ Peoples was charged with six counts of knowingly neglecting a nursing facility resident, a class D felony. § 198.070.11.[2] Neglect, for purposes of the offense, is defined in § 198.006(11):

[T]he failure to provide, by those responsible for the care, custody and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result.

A person acts knowingly when she is aware of the nature of her conduct or that her conduct is practically certain to cause a particular result. § 562.016.3. Thus, the elements of the offense are that (a) the defendant is responsible for the care, custody and control of a nursing home facility resident; (b) the defendant knowingly fails to provide the services which are reasonable and necessary to maintain the physical and mental health of the resident; and (c) such failure presents *either* (1) an imminent danger to the health, safety or welfare of the resident, *or* (2) a substantial probability that death or serious physical harm will result. In the case at bar, the State, for whatever reason, chose to submit solely on the theory that Peoples conduct created *"a substantial probability that death or serious physical harm would result."* The State chose not to submit on the basis that the conduct presented *"an imminent danger to the health, safety or welfare of the resident."* As a result, it was incumbent on the State to prove that Peoples knowingly failed to pro-

---

**2.** Section 198.070.11 was challenged as constitutionally vague in *State v. Dale*, 775 S.W.2d 126 (Mo. banc 1989). Our Supreme Court rejected this argument, holding that the statutes governing neglect of a resident of a nursing facility "adequately inform people ... about the conduct that is expected of them, punishing them only if they act knowingly." *Id.* at 131. According to

our Supreme Court, " § 198.070.11 is violated only if Class I violations are shown." *Id.* at 133. Class I violations are those which present an imminent danger to health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result. § 198.085(1).

vide services to Herman which were reasonable and necessary to maintain his physical and mental health, *and* that such failure created *"a substantial probability that death or serious physical harm would result."*

We first address Counts I through V, leaving Count VI for separate discussion, *infra.*

█ The State's evidence clearly established that Latham Care Center is a nursing home facility as contemplated by the statute. It likewise is undisputed that Herman was a resident of the facility and Peoples was the Director of Nursing. As such, the record reveals that Peoples was generally responsible for assessing and caring for all patients. The evidence further established that Herman vomited a total of seventeen times during the 42 hours preceding his death and that Peoples was apprised of Herman's condition at least six times during this time period. Dr. Jay Dix, an associate professor of pathology at the University of Missouri in Columbia and the Boone and Callaway County Medical Examiner, opined that Peoples was negligent in failing to notify a physician. Victoria Ferretti, a facility advisory nurse with the Division of Aging for the State of Missouri, also testified that Peoples failure to call a doctor constituted neglect.

This was the sum and substance of the State's case. It clearly established that Peoples' was guilty of common law negligence, i.e., she owed a duty of care to Herman and breached that duty by failing to call a doctor. Moreover, one could reasonably infer that she acted recklessly, with a willful and wanton disregard for Herman's welfare. However, the evidence in no way establishes that Peoples' failure to call a doctor for Herman presented a "substantial probability that death or serious physical harm would result."

As noted earlier, Dr. Jay Dix opined that after discovering that Herman had been vomiting repeatedly, some of which was a "coffee color," the proper care would have been to notify a physician. However, Dr. Dix was unable to present any evidence, or offer an opinion, that the failure to provide proper care by calling a doctor presented a substantial probability that Herman would die or suffer serious physical harm. Dr. Dix's testimony establishes only that Herman suffered from heart disease, from which death was unpreventable, and that the bleeding in his lower gastro-intestinal tract contributed to his death. At no point in his testimony does Dr. Dix correlate Herman's vomiting, or the lack of attention thereto, to either cause of death. There was no evidence that Herman's repetitive vomiting strained his heart, resulting in arrhythmia or an abnormal heart beat. Similarly, there was no evidence that the vomiting provoked the bleeding in Herman's GI tract, thereby contributing to his death. Finally, and most notably, Dr. Dix testified that he did not find the site of the bleeding in Herman's GI tract and, therefore, could not determine whether it could have been prevented. Thus, even if there was blood in Herman's emesis and a doctor were so advised, there was no evidence that the site of bleeding could have been discovered and treated, thereby avoiding either serious physical harm to Herman or prolonging his life.

The only other evidence the State presented in an effort to carry its burden on this issue was the testimony of Victoria Ferretti.[3] Ferretti is a registered nurse and previously had been employed as the director of nursing at a nursing care facility. As a facility advisory nurse, Ferretti inspects nursing facilities. She inspected the Latham Care Center on September 23, 1994. As indicated *supra,* Ferretti testified that the failure to call a doctor after 17 episodes of vomiting over the course of 42 hours constituted neglect. However, she nowhere testifies that such neglect created a substantial probability of death or serious physical harm.

The State's evidence overwhelmingly proved a case of common law negligence, i.e., malpractice, against Peoples. However, in criminalizing a care provider's neglect of a nursing home resident, the Legislature re-

---

**3.** The State does assert that Herman's death certificate, which listed as the cause of death cardiac arrest due to "vag[a]l stimulation, as a consequence of vomiting," provides the needed evidence. However, it is uncontroverted that Dr. Debra Buckler, who signed the certificate never saw Herman, either while he was alive or after his death.

quired far more than ordinary negligence. It required that the defendant act knowingly and, more importantly, as submitted in this case, that the defendant's neglect presents a substantial probability of death or serious physical harm. In the case at bar, the State failed to carry its burden to establish criminal liability. In the absence of expert testimony that Peoples' failure to notify a doctor of Herman's condition presented a probability of serious physical harm or death, there is no evidence from which a jury could make that finding.[4] Consequently, the State failed to prove each and every element of its case. As such, there was insufficient evidence to support Peoples' convictions on Counts I through V.

■ Peoples' third and final point challenges the submission of Instruction 11, the verdict director for count VI. Here again, the attack is, in actuality, a challenge to the sufficiency of the evidence to support the conviction. Instruction 11 reads:

As to Count VI, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or About September 21, 1994, in the County of Moniteau, State of Missouri, Edwin Herman was a resident of an intermediate care facility, and

Second, that on that date, the defendant was responsible for the care, custody and control of Edwin Herman, and

Third, that on that date the defendant knowingly failed to provide reasonable and necessary emergency medical care, life support and transport for Edwin Herman upon learning that he had collapsed with no vital signs, and

Fourth, that such failure to provide care by defendant presented a substantial probability that death or serious physical harm would result,

then you will find the defendant guilty under Count VI of Neglect of a Resident of a Nursing Home Facility.

Peoples contends that this instruction is predicated on the fact that Herman was alive when he was discovered lying on the floor of his bedroom on the morning of the 21st of September. Peoples argues that there was no evidence adduced to support this finding, and therefore the jury had to speculate to find her guilty. The State argues to the contrary that "the jury could reasonably have determined that Mr. Herman was still alive at the time the last telephone call was made to the appellant, and that the appellant's inexplicable failure to direct the nurse's aide to begin CPR or summon paramedics presented a 'substantial probability that death' would occur from the appellant's total and complete inaction."

The State presented no evidence that Herman was alive when he was discovered by certified nurse's aid, Donna Sanders. Sanders testified that she found Herman laying in the doorway to his room in the early morning hours of September 21, 1994, and immediately telephoned Peoples, who indicated she would get dressed and be right in. Sanders then checked Herman for vital signs and was unable to detect a pulse or blood pressure. From the evidence, a juror would have to engage in speculation to determine that Herman was alive when Sanders called Peoples. Moreover, there was no evidence that anyone qualified to perform CPR was reasonably available. Sanders was not qualified. Likewise, there was no evidence that performing CPR or summoning paramedics would have, or even could have, revived Herman. Since the only inference to be drawn from the evidence was that Herman was already deceased when Sanders called Peoples, it is difficult to see how Peoples failure to give

---

4. *See State v. Dale,* 775 S.W.2d 126 (Mo. banc 1989) (State presented expert testimony that bedsores would not develop and progress in patients receiving proper nursing care); *State v. Puchta,* 786 S.W.2d 154 (Mo.App. E.D.1990) (State failed to present expert testimony that the conditions of dehydration or malnutrition were the result of neglect and not the result of medical conditions attributable to other diagnosed conditions; State failed to present evidence that failure to check restraints every thirty minutes and release restraints every two hours on day of death constituted an imminent danger to the health, safety or welfare of patient); and *State v. Schmidt,* 802 S.W.2d 200 (Mo.App. E.D.1991) (State presented expert testimony that failure to have an egg create mattress would present an imminent danger to the health, safety and welfare of person with bedsores).

instructions to try to revive him could create a substantial probability of his death or serious physical harm. At any rate, the evidence does not support the submission of Instruction 11 or the resulting conviction on Count VI.

The judgments of conviction on Counts I through VI are reversed.

All concur.

