STATE OF MISSOURI, Respondent,

v.

Joseph K. McELVAIN, Appellant.

No. WD 66589.

Missouri Court of Appeals,
Western District.

June 29, 2007.

**594**

Kent Denzel, Columbia, MO, for appellant.

Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for respondent.

Before NEWTON, P.J.,
BRECKENRIDGE and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Judge.

Joseph K. McElvain appeals his conviction for felony stealing, under section 570.030, RSMo Cum.Supp.2004, after a jury trial. Mr. McElvain waived jury sentencing and the trial court sentenced him to two years imprisonment. In his first point on appeal, Mr. McElvain asserts that the trial court abused its discretion in overruling his motion to exclude and in admitting evidence concerning a plastic bag and its contents that police officers recovered because the officers failed to preserve the material found in the bag according to the procedure set forth in section 490.733.2, RSMo 2000.[1] In his second point on appeal, Mr. McElvain contends that the trial court abused its discretion in denying his motion to suppress evidence that an eyewitness identified him from a photograph shown to the eyewitness by a deputy and in overruling his objection to that evidence at trial. Mr. McElvain claims the identification procedure was impermissibly suggestive and un-

reliable. Finding no error, the trial court's judgment is affirmed.

## Factual and Procedural Background

Sometime between 12:00 and 12:30 p.m. on June 7, 2005, A.J. McConkey drove past an MFA elevator in Albany and noticed a motorcycle parked in the lot close to a row of anhydrous ammonia tanks. Mr. McConkey thought that the motorcycle looked out of place and parked his car to see what was going on. He then saw a man standing by an anhydrous ammonia tank step on the front tire of the tank, put a plastic bag over the valve of the tank, and turn the valve on. Mr. McConkey noticed that the bag "puffed up like it had something in it." Mr. McConkey then went to the scale house and told the elevator manager, David Kent, "that there was somebody taking some anhydrous." Mr. Kent looked out the window and saw someone drive off the lot on a motorcycle, carrying a bag in his left hand. About 12:45 p.m., Mr. Kent called the police.

Gentry County Sheriff Eugene Lupfer and Deputy Nick Tompkins responded to Mr. Kent's call. Sheriff Lupfer and Mr. Kent inspected the anhydrous ammonia tanks and discovered that one of the tanks had frost around the valve, which indicated that ammonia had flowed through the valve within the previous ten to fifteen minutes. They also discovered that the dust cap covering the valve had been removed.

Mr. Kent told the officers that the suspect was wearing jeans and a tank top and riding a motorcycle. Deputy Tompkins then went looking for the suspect. Deputy Tompkins called Greg Harner, an officer with the ATF NITRO task force, and picked up Officer Harner at his residence.

---

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

Officer Harner had observed Mr. McElvain leaving his home on a motorcycle around 12:00 to 12:30 p.m. that day. As Deputy Tompkins and Officer Harner were driving on State Route 6, about six miles north of Albany, they encountered Mr. McElvain walking along the highway, wearing jeans and a tank top. Mr. McElvain told the officers that his motorcycle had broken down. Deputy Tompkins told Mr. McElvain that he matched the description of an individual that had been seen leaving the MFA depot. The officers placed Mr. McElvain in handcuffs and put him in the back seat of the patrol car.

The officers then drove Mr. McElvain to the road where Mr. McElvain's motorcycle had broken down. Deputy Tompkins noticed a locked bag on top of the motorcycle's gas tank, which had "a very faint odor of ammonia, rotten eggs." Deputy Tompkins was familiar with the smell of anhydrous ammonia from his "[d]ays at the farm when [he] was working on the farm, around farmers, row cropping." Deputy Tompkins took pictures of the motorcycle and then transported Mr. McElvain to the sheriff's department for booking.

Sheriff Lupfer also went to the location where Mr. McElvain's motorcycle was parked. He searched the area surrounding the motorcycle and found a clear plastic bag lying in the grass about twenty feet north of where Mr. McElvain's motorcycle was found. The bag had about a teacup full of liquid in the bottom, was very cold, had frost on the outside, and had "an ammonia smell to it." The grass around where the bag was found had turned black.

Sheriff Lupfer did not have any equipment with which to preserve the liquid in the bag and did not know of anyone to call who could take a sample. While Sheriff Lupfer wanted to preserve the substance in the bag, he realized that within thirty minutes the substance "was going to be gone, would be evaporated." Therefore, in an effort to preserve the substance, one of the deputies retrieved a coffee can with a lid from his car. Sheriff Lupfer wadded the plastic bag up, put it in the coffee can, and then put the lid on the can. The officers then called the station to have someone bring a cooler to them so that they could put the coffee can in the cooler. While they waited for someone to bring the cooler, the officers sat the coffee can along the side of the road. When someone arrived with the cooler, the officers put the coffee can in the cooler and then transported the cooler to the station. The officers placed the cooler in a storage shed at the sheriff's department, where it remained until pretrial.

About 3:00 p.m. on the afternoon of June 7, Mr. McConkey went to the sheriff's department. Deputy Tompkins showed Mr. McConkey the picture of Mr. McElvain that he had taken when he booked Mr. McElvain. The picture of Mr. McElvain was the only picture shown to Mr. McConkey. Mr. McConkey told Deputy Tompkins that the individual in the picture appeared to be the person he observed at the MFA tank.

The State subsequently charged Mr. McElvain with the class C felony of stealing, under section 570.030, RSMo Cum. Supp.2004. On December 19, 2005, a jury found him guilty. Mr. McElvain waived jury sentencing and the trial court sentenced him to two years in prison. This appeal followed.

## Standard of Review

In both Mr. McElvain's points on appeal, he challenges the trial court's admission of certain evidence. The trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). This court will reverse the "'trial court's ruling on the admission of

evidence only if the court has clearly abused its discretion.' " *Id.* (footnote omitted). The trial court abuses its discretion " 'when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Id.* (footnote omitted). Moreover, this court reviews " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *Id.* at 223–24 (footnote omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 224.

## No Abuse of Discretion in Admitting Evidence Concerning Contents of Plastic Bag

■ In his first point on appeal, Mr. McElvain asserts that the trial court abused its discretion in overruling his motion to exclude and in admitting evidence concerning the plastic bag and its contents, because the officers failed to preserve the material found in the bag according to the procedure set forth in section 490.733.2. Moreover, Mr. McElvain claims that, in failing to collect representative samples of the material in the bag before allowing it to dissipate, the officers acted in bad faith.

Prior to trial, Mr. McElvain filed a motion to suppress "all physical evidence concerning a plastic bag, its contents, and any testimony regarding such evidence." Mr. McElvain claimed that the evidence should be suppressed because no laboratory tests were performed on the contents of the bag and the officers did not retain a representative sample of the contents, as required by section 490.733.2. Thereafter, Mr. McElvain filed a "Motion to Exclude Evidence Amending Previously Filed 'Motion to Suppress,' " in which he made the same argument.

On December 15, 2005, the trial court held a hearing on Mr. McElvain's motion to exclude and took the matter under advisement. Review of the transcript of the trial reflects that the trial court denied Mr. McElvain's motion to exclude. At trial, when the State began to question Sheriff Lupfer about the plastic bag, Mr. McElvain objected on the grounds that admission of the evidence regarding the contents of the plastic bag violated his due process rights because the officers' conduct violated section 490.733.2. The trial court overruled Mr. McElvain's objection.

The section referenced in Mr. McElvain's objection, section 490.733.2, provides:

> Notwithstanding the provisions of section 575.100, RSMo, and with the approval of the affected court, any law enforcement officer who seizes hazardous materials as evidence related to a criminal investigation *may* collect representative samples of such hazardous materials, *and destroy or dispose of,* or direct another person to destroy or dispose of the remaining quantity of such hazardous materials.

(Emphasis added.) Mr. McElvain argues that the plain language of section 490.733.2 "requires that a police officer, before destroying seized evidence of hazardous materials, obtain approval from the affected court to do so." He further claims that, under the statute, an "officer needs the court's permission to maintain only a representative sample." In essence, the gist of Mr. McElvain's claim is that the trial court should have excluded all of the evidence and testimony surrounding the contents of the plastic bag at trial as a sanction for the officers' violation of section 490.733.2.

In *State v. Smith,* this court addressed the question whether, under section 490.733.2, dismissal of a claim for manufac-

turing a controlled substance was required when law enforcement did not retain representative samples of ether and anhydrous ammonia. 157 S.W.3d 687, 690–91 (Mo.App. W.D.2004). In that case, law enforcement seized a cooler, which contained anhydrous ammonia, and another cooler, which contained a mason jar filled with ether. *Id.* at 689. Law enforcement did not collect representative samples or obtain court approval but, rather, the ether was photographed, placed in a container, and "destroyed in accordance with DEA and EPA guidelines." *Id.* at 689–90. The anhydrous ammonia was also photographed and placed in a container but, while awaiting transport to the destruction sight, "expanded, burst its container," and evaporated. *Id.* at 690. At trial, the defendant moved to dismiss the manufacturing charge because the officers destroyed the alleged ether without getting prior approval of the court and without collecting representative samples, in violation of section 490.733.2. *Id.* at 689. The trial court denied the defendant's motion finding that section 490.733 did not mandate the state to preserve representative samples of the hazardous materials. *Id.* The defendant appealed to this court.[2] *Id.* at 690.

On appeal, this court disagreed with the defendant's claim. This court found that, even if section 490.733.2 required officers to obtain a court order before destroying hazardous evidence, because the statute "does not specify any certain remedy," failure to follow the procedures set forth in the statute did not require dismissal of the charges against the defendant. *Id.* at 691. This court noted, however, that the Eastern District of this court in *State v. Puckett*, 146 S.W.3d 19, 24 (Mo.App. E.D.2004), compared section 490.733.2 to Rule 25.18, "Missouri's discovery rule that allows the exclusion of evidence as a sanction for the

violation of rules and orders." 157 S.W.3d at 691. In particular, *Puckett* noted that "'[a]s with our Supreme Court's discovery rules, the statute sets forth requirements for the procedural handling of evidence that strike a balance between the State's duty to preserve evidence and the defendant's right to access evidence necessary for [his or] her defense.'" *Smith,* 157 S.W.3d at 691 (citing *Puckett,* 146 S.W.3d at 24). In *Smith,* this court expressly did not address the question whether the court should have excluded the officer's "'sight and smell'" evidence of ether and anhydrous ammonia as a sanction for violation of section 490.733.2, because the issue was not raised on appeal. 157 S.W.3d at 690 n. 3, 691. Mr. McElvain claims this case presents the question left open by *Smith,* i.e., the proper remedy for violation of section 490.733.2.

This case, however, is factually distinguishable from *Smith.* In *Smith,* as discussed above, the officers actively took steps to "destroy or dispose of" the hazardous materials. Section 490.733.2. Thus, section 490.733.2, was arguably applicable. Here, the officers did not attempt to "destroy or dispose of" the anhydrous ammonia. Rather, Sheriff Lupfer testified that the substance in the bag was evaporating "so fast" that a deputy retrieved a coffee can from his car, they wadded the bag up, put it in the coffee can, put the lid on the can, and then, when another officer arrived with a cooler, they put the can in the cooler. A reasonable inference from Sheriff Lupfer's testimony is that the officers were not attempting to destroy or dispose of the substance but, rather, were attempting to preserve it. Based on the chemical properties of anhydrous ammonia, however, despite the offi-

---

2. Although the evaporation of anhydrous ammonia occurred in *Smith,* Mr. Smith limited

his claim on appeal to the disposal of the ether. 157 S.W.3d at 690 n. 3.

cer's efforts, the liquid in the bag evaporated and, therefore, was not preserved.

"[S]ection 490.733.2 sets forth a procedure for the *destruction* of hazardous materials related to a criminal investigation." *Puckett*, 146 S.W.3d at 24 (emphasis added). Here, the evidence was that Sheriff Lupfer wanted to preserve the substance in the bag, not destroy it. Unlike the officers in *Smith*, the officers in this case took no steps to destroy the hazardous substance but, rather, sought to find a method whereby the substance could be sealed and, therefore, preserved. Thus, section 490.733.2 is not applicable in this case.

 While Mr. McElvain acknowledges that the officers did not "actively destroy the substance in the plastic bag," he nevertheless argues that because the officers "took absolutely no action to preserve the material," his "rights to due process and to present a defense" were violated. This court disagrees. First, as discussed above, the officers did take steps to preserve the evidence. Second, the failure to preserve potentially useful evidence does not rise to the level of a denial of due process " '[a]bsent a showing of bad faith on the part of the police or prosecutor.' " *State v. Berwald*, 186 S.W.3d 349, 366 (Mo. App. W.D.2005) (citation omitted). "[B]ad faith is the destruction of the evidence by a state actor 'for the purpose of depriving the defendant of exculpatory evidence[.]' " *Id.* at 366–67 (citation omitted). To be entitled to relief for failure to preserve evidence, Mr. McElvain must "show that the evidence had an exculpatory value that was apparent to the State before it was destroyed." *Id.* at 367 (citing *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). "Accordingly, for due process purposes, bad faith turns on law enforcement's ' "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." ' " *Id.*

(citing *Smith*, 157 S.W.3d at 691 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988))).

First, Mr. McElvain claims that the officers acted in bad faith because they failed to follow the procedures set forth in section 490.733.2. As discussed above, however, section 490.733.2, which is applicable to the destruction of evidence, is not applicable in this case because the officers did not destroy the evidence but, rather, attempted to preserve it. Moreover, other evidence suggests that the evidence was not exculpatory. Sheriff Lupfer testified that when he discovered the bag, it had about a teacup full of liquid in the bottom, was very cold, had frost on the outside, and had "an ammonia smell to it." Sheriff Lupfer also testified that, over the course of his life and in his experience in law enforcement, he has had experience with anhydrous ammonia regarding methamphetamine labs and anhydrous ammonia leaks at elevators. He further testified that, on a scale of one to ten, with ten being the strongest, the smell of ammonia was a ten. Moreover, the grass around where the bag was found had turned black. Thus, the record overwhelmingly suggests that the properties of the substance found in the bag were consistent with those the officers knew to be anhydrous ammonia and, therefore, the evidence was inculpatory.

Mr. McElvain also claims that the officers acted in bad faith because they failed to follow a Highway Patrol procedure for submitting anhydrous ammonia for testing. Specifically, at trial, Mr. McElvain admitted into evidence Exhibit B, which he identified as "the Missouri State Highway Patrol lab page that deals with how anhydrous samples should be submitted or . . . samples that are taken from suspected anhydrous" should be submitted. Mr. McElvain then read to the jury section E,

which stated, "Due to the physical properties of anhydrous ammonia, it is not accepted into the laboratory and likewise is not subject to analysis. Anhydrous ammonia can be mixed with water, (preferably distilled) and submitted with a water blank to be tested." Relying on this evidence, on appeal, Mr. McElvain argues that "[a]ll the officers had to do was add water and the resultant mixture could have been tested for ammonia." Thus, Mr. McElvain concludes that because the officers failed to follow this procedure, they acted in bad faith.

At trial, the State called as rebuttal to Mr. McElvain's Exhibit B, Aaron Jones, an employee with the Maryville Department of Public Safety who has special training in the collection and disposal of hazardous substances, including anhydrous ammonia. Mr. Jones testified regarding the procedure for dealing with anhydrous ammonia discovered in an unapproved container. Mr. Jones testified that in situations where anhydrous ammonia is encountered in an unapproved container, the proper procedure is to "isolate the area, contact the appropriate emergency response personnel, and keep a safe distance away from the unapproved container until it can be properly collected and disposed of." Mr. Jones also testified that in all of the cases where he has been called to deal with a situation involving anhydrous ammonia, the substance has never been preserved for testing because the substance is too dangerous to try to put into another unapproved container. Mr. Jones testified that he did not know of any type of container that a test sample of anhydrous ammonia could be put in where it would be safe to collect and transport. Mr. Jones testified that in such situations, the Missouri Department of Natural Resources recommends that disposal occur "on sight into the environment."

In addition, Mr. Jones disagreed that the portion of Exhibit B read to the jury described a method to take samples of anhydrous ammonia. He testified that Exhibit B was a technical bulletin that was produced by the Department of Natural Resources that does not address the procedures for gathering and retaining samples of suspected anhydrous ammonia. Rather, Mr. Jones explained that when section E of Exhibit B is read with the preceding paragraph, the bulletin is referring to situations when the substance has "already been disposed of into a proper environmental setting in a rural area after the container is then decommissioned to properly clean the container so it no longer has any residue in it, is to rinse it out with water, not to contain the anhydrous or take a sample."

Mr. McElvain characterizes the content of Exhibit B, from which he read at trial, differently than Mr. Jones did in his testimony. Unfortunately, Mr. McElvain did not include Exhibit B in the record on appeal. Mr. McElvain, as the appellant, had the "duty to file a complete record including all evidence necessary to determine all questions presented to this [c]ourt for review." *State v. Morin*, 873 S.W.2d 858, 867 (Mo.App. S.D.1994). "[A]ny exhibit not produced in compliance with [Rule 30.05] may be considered by the appellate court as immaterial to the issues on appeal." *Id.* Even if this court considered the excerpt from Exhibit B read by Mr. McElvain at trial, the excerpt included the statement that, due to the physical properties of anhydrous ammonia, the substance is *not* subject to analysis. The record at trial supports a finding that the officers' failure to just "add water" to the substance in the bag did not constitute bad faith.

In sum, because the officers did not destroy or dispose of the anhydrous am-

monia but, rather, attempted to preserve the substance, section 490.733.2 was inapplicable. Mr. McElvain also failed to show that the officers acted in bad faith in failing to preserve the evidence because he did not demonstrate that its exculpatory value was apparent to the officers before the substance evaporated or that the officers failed to preserve the evidence for the purpose of depriving him access to exculpatory evidence. Finally, Mr. McElvain failed to show that the officers had the ability to safely preserve a sample for testing. Consequently, the trial court did not abuse its discretion in overruling Mr. McElvain's motion to exclude and in admitting evidence concerning the plastic bag and its contents. Point denied.

### No Abuse of Discretion in Admission of Identification Evidence

In his second point on appeal, Mr. McElvain contends that the trial court abused its discretion in denying his motion to suppress evidence that Mr. McConkey identified him from a photograph shown to Mr. McConkey by Deputy Tompkins and in overruling his objection to that evidence at trial. Mr. McElvain claims the identification procedure was impermissibly suggestive and, therefore, Mr. McConkey's identification was unreliable.

Prior to trial, Mr. McElvain filed a motion to suppress the in-court and out-of-court identification of Mr. McElvain by Mr. Kent and Mr. McConkey.[3] Mr. McElvain alleged that Deputy Tompkins showed Mr. Kent and Mr. McConkey only one photograph, which was of Mr. McElvain, and this procedure was inherently suggestive.[4] At the hearing on the motion to suppress, Deputy Tompkins testified that

he photographed Mr. McElvain during the booking process and he showed the picture he took of Mr. McElvain to Mr. McConkey when Mr. McConkey came to the department later that afternoon to give a statement. Deputy Tompkins testified that Mr. McConkey told him that the individual in the picture appeared to be the individual he observed at the MFA tank. Deputy Tompkins also testified that Mr. McConkey told him that he wished he could see a "back head shot of him" because he observed the individual "going away from him." At the suppression hearing, Mr. McConkey testified that there was no doubt in his mind that the individual in the picture was the same person he saw at the MFA tank. Mr. McConkey also testified that he did not remember telling Deputy Tompkins that he wished he could see a picture of a back view of the individual in the photograph. At the end of the hearing, the trial court took the matter under advisement. Based on the record on appeal, there is no indication that the trial court ruled on Mr. McElvain's motion to suppress.

At trial, when the State began to question Mr. McConkey about the identification, Mr. McElvain objected. The trial court overruled the objection and Mr. McConkey testified that he identified the individual in the picture shown to him by Deputy Tompkins as the man at the anhydrous ammonia tank.

The court undertakes a two-part analysis to determine whether pretrial or in-court identification of a defendant is admissible. *State v. Glover*, 951 S.W.2d 359, 362 (Mo.App. W.D.1997). In the first step, a determination must be

---

**3.** On appeal, Mr. McElvain's claim of error is limited to Mr. McConkey's pretrial, out-of-court identification of Mr. McElvain, as Mr. McConkey was never asked to identify Mr. McElvain in court during trial.

**4.** While Deputy Tompkins showed Mr. McConkey only one picture of Mr. McElvain, the one picture actually included a side view and front view of Mr. McElvain.

made whether the lineup was "'unnecessarily suggestive and conducive to irreparable mistaken identification....'" *Id.* (citation omitted). "A pretrial identification procedure is unduly suggestive if the identification results not from the witness's recall of first-hand observations, but rather from the procedures or actions employed by the police." *Id.* If the court finds that the pretrial identification procedures were unduly suggestive, the second step is to "determine whether the suggestive procedures have so tainted the identification as to lead to a substantial likelihood that the pretrial identification was not reliable." *Id.*

▆▆▆▆ Regarding reliability, five factors are considered:

"(1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation."

*Id.* at 363 (citations omitted). Mr. McElvain must establish the first prong of the test, however, "before a review of the reliability of the identification is necessary or appropriate." *Id.* If Mr. McElvain fails "to establish that police procedures were unduly suggestive, the factors considered in the reliability prong of the test go to the weight of the identifications and not to their admissibility." *Id.* at 364.

Regarding the first prong, Mr. McElvain claims that the pretrial identification procedure was unduly suggestive because Deputy Tompkins only showed Mr. McConkey one photograph. Mr. McElvain, however, concedes that Missouri cases have recognized that the "showing of a single photograph of a defendant to a witness where there is no improper comment or activity on the part of the officer showing the photograph does not result in impermissible suggestiveness." *State v. McGrath,* 603 S.W.2d 518, 520–21 (Mo. 1980). *See also Glover,* 951 S.W.2d at 363 ("Missouri has rejected the contention that a lineup involving a single photograph—a show-up—is necessarily unduly suggestive." (citing *State v. Dodson,* 491 S.W.2d 334, 338 (Mo. banc 1973), and *State v. Williams,* 717 S.W.2d 561, 563 (Mo.App. E.D.1986), for proposition)).

The only other conduct on the part of Deputy Tompkins that Mr. McElvain claims made the identification procedure unduly suggestive is that Deputy Tompkins "suggested [to Mr. McConkey] that the man in the photograph had been arrested for the crime" and that "there was no excuse for showing Mr. McConkey a single photograph, other than the fact that the deputy would have had to go through the files." Regarding Mr. McElvain's claim that Deputy Tompkins would have had to go through files to obtain additional photographs, this argument is unconvincing. Clearly, in any case where law enforcement shows an eyewitness only one photograph, this same claim could be made. Yet, Missouri fails to find such a procedure necessarily unduly suggestive. *See McGrath,* 603 S.W.2d at 520–21. Moreover, the record does not support Mr. McElvain's claim that Deputy Tompkins suggested to Mr. McConkey that the individual in the photograph had been arrested. Rather, at the pretrial hearing, Deputy Tompkins was asked whether Mr. McConkey knew that the individual in the photograph had been arrested. Deputy Tompkins answered, "No, I don't think so. Not at that time[, i.e., the time he was shown the photograph]." Thus, Mr. McElvain has failed to demonstrate any conduct on the part of the State that made the identification procedure unduly suggestive.

Mr. McElvain makes several additional arguments as to why the identification pro-

cedure was unduly suggestive. For example, he claims that because Mr. McConkey's description of the "thief's shirt color did not match what Mr. McElvain was wearing," and Mr. McConkey wished that there was a photograph of Mr. McElvain from the back, the procedure was unduly suggestive. As noted above, however, "[a] pretrial identification procedure is unduly suggestive if the identification results not from the witness's recall of first-hand observations, but rather from the procedures or actions employed by the police." *Glover*, 951 S.W.2d at 362. Mr. McConkey's description of shirt color and desire for a view of the individual from the back relate to "the witness's recall of first-hand observations," which are factors relevant to the second step, reliability, not to "procedures or actions employed by the police." *Id.* Therefore, these observations do not make the identification procedure unduly suggestive. Thus, Mr. McElvain has failed to establish the first prong of the two-part test.

Failing to establish that the police procedures were unduly suggestive, as stated above, review of the reliability factors is unnecessary because "the factors considered in the reliability prong of the test go to the weight of the identification and not to their admissibility." *Id.* at 363–64. At trial, defense counsel was free to cross-examine Mr. McConkey about his identification of Mr. McElvain. The reliability of Mr. McConkey's identification was for the jury to weigh. Accordingly, the trial court did not abuse its discretion in failing to suppress Mr. McConkey's pretrial identification of Mr. McElvain. Point denied.

The trial court's judgment is affirmed.

All concur.

In re K.N.H. and J.D.H., Plaintiffs.