**STATE of Missouri, Respondent,**

v.

**BOONE RETIREMENT CENTER, INC., Appellant.**

**Nos. WD 56396, WD 56409.**

Missouri Court of Appeals, Western District.

June 27, 2000.

*Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2000.*

Application for Transfer Denied Oct. 3, 2000.

266

James R. Hobbs, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Gregory J. Scott, Asst. Attys. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, C.J., LAURA DENVIR STITH and RIEDERER [1], JJ.

PER CURIAM.

Boone County Retirement Center, Inc. (BRC) and Patrick D. Rackers (Rackers) appeal their convictions, respectively, of two counts each of the class D felony of neglect of a nursing home resident pursuant to § 198.070.11.[2] BRC is a not-for-

---

1.  Judge Riederer resigned from this court prior to the issuance of this opinion.

2.  All statutory references are to RSMo, 1994, unless otherwise indicated.

profit corporation operating a nursing home in Boone County, Missouri, and Rackers was, at all relevant times, the administrator of the nursing home. BRC admitted both private pay and Medicaid residents. BRC and Rackers were originally charged by a 36–count indictment (18 counts against each) of neglect under § 198.070.11, and making a false representation to receive a health care payment, under § 191.905.1. The charges arose from a hotline investigation conducted by the Missouri Division of Aging (DOA) in September of 1995. The investigation resulted in the issuance of numerous state and federal regulatory citations for such issues as prevention and quality of care for pressure sores, nutrition and nursing care. Two residents, Eva Sapp and Mary Johnson, died in September 1995. Allegedly, bed sores, or pressure sores, and complications contributed to the deaths.

On September 9, 1997, by leave of court, the state filed an Information in Lieu of Indictment (Information) charging 25 counts against each defendant. There were eight counts against each defendant for "neglect" and 34 counts of false representation to receive a Medicaid payment. After trial by jury, each defendant was convicted of two counts of neglect dealing with Sapp and Johnson. Rackers and BRC were acquitted of all the other charges, including charges related to pressure sores of other nursing home residents. Their motions for new trial were denied and they were sentenced.[3] They now appeal.

Both contend that (1) there was insufficient evidence to convict; (2) the trial court erred in allowing the filing of the Information in Lieu of Indictment because it charged new and distinct offenses; (3) the Information did not sufficiently inform them of the basis of the neglect charges; and (4) the trial court erred in allowing

3. Each defendant was fined on each count with part of the fine stayed by the court.

4. The remaining counts of the indictment dealt with the false claim statement charges

expert testimony by a witness not qualified to render such opinions. BRC raises two separate grounds claiming the indictment and information should have been dismissed for failure to identify the "high managerial agents" upon whom corporate criminal liability was based and because BRC was statutorily immune under § 198.012 as a quasi-governmental body.

### Information in Lieu of Indictment

The defendants first argue that the trial court erred in allowing the information to be filed because it charged new and distinct offenses although brought under the same criminal statutory sections. The Indictment contained the following charging language against BRC and Rackers in Count 1:

Defendant Patrick D. Rackers knowingly neglected Eva Sapp, a resident of a facility as defined in Section 198.006(6), RSMo by failing to provide reasonable and necessary services, items and supplies to prevent and treat decubitus ulcers which presented a danger to the health, safety and welfare of said Eva Sapp, and Patrick D. Rackers engaged in the conduct constituting this offense as a high managerial agent of the defendant Boone County Retirement Center, Inc. and acted within the scope of his employment and in behalf of the defendant corporation.

Count VII made the same neglect charge as to resident Mary Johnson.[4]

### The Standard of Review

Whether to allow the amendment of an information or substitution of an information in lieu of an indictment rests within the discretion of the trial court. Rule 23.08 provides in relevant part:

concerning Sapp and Johnson and neglect and false claim charges involving other residents of BRC.

Any information may be amended or substituted for an indictment at any time before verdict or finding if no additional or different offense is charged and if a defendant's substantial rights are not thereby prejudiced.

■ Our standard of review on appeal is for abuse of discretion. *State v. Endicott,* 881 S.W.2d 661, 663 (Mo.App.1994). An amendment or substitution is not permissible if it charges a different offense. *State v. Messa,* 914 S.W.2d 53, 54 (Mo.App. 1996). Amendment or substitution is also prohibited if the defense would be prejudiced. *Id.* The test of prejudice is whether the planned defense to the original charge would still be available after the amendment. *Id.* at 54–55.

■ Rackers and BRC have common and also separate arguments about the Information in Lieu of Indictment. Both contend that the Information charged different offenses. Both charging instruments alleged a failure to supply the two residents "services, items and supplies." The original Indictment modified those terms by the phrase "that were necessary to prevent and treat decubitus ulcers." The Information does not contain the reference to decubitus ulcers and both defendants complain that as a result, the charges were broadly expanded resulting in the allegation of new or different offenses. They claim prejudice because the DOA investigation included complaints not related to individual patients and involved general nursing home conditions not related to the treatment of decubitus ulcers. The state argues in response that both documents charge neglect under § 198.070.11, set forth the statutory elements of neglect, and that the reference to decubitus ulcers was mere surplusage. As a result, the state argues, there was no new or different offense charged in the Information.

Neither Rackers nor BRC point to any case holding that an amendment or substitution involving the same statutory section constitutes the charging of a new offense.

The charges against the defendants, both before and after the substitution, charged neglect of the same nursing residents under the same statutory section. We do not believe that the Information charged a new or different offense against either defendant by deleting the reference to treatment of decubitus ulcers. We must still consider whether defendants were prejudiced by the amendment.

■ They do not set forth what defense would have been available to them under the original indictment but was eliminated by the information; nor do they identify what change occurred in the evidence available to them after the information was filed. The state's response to their request for bills of particulars alleged neglect only by failure to provide services and supplies necessary to prevent and treat decubitus ulcers. We agree with the state that in this instance the amendment made no real change in the theory they prosecuted. The defense was that Rackers and BRC acted appropriately in providing care to the two nursing home residents. There was no error in permitting the elimination of the reference to decubitus ulcers.

■ BRC separately argues that the Information in Lieu of Indictment contained other changes with respect to the charges against it and that it was prejudicial error to have allowed its filing. The standard of review is the same as discussed above. The original indictment combined the neglect counts against Rackers and BRC; the substituted Information separated the charges against the corporate entity from the individual charges against Rackers. BRC claims that the original indictment premised the corporation's criminal liability only upon the actions or inaction of Rackers as the "high managerial agent" specified in § 198.070.11, RSMo. BRC claims that the Information in Lieu of Indictment expands the identity of high managerial agents to include persons other than Rackers. This, they claim, violates

Rule 23.08 as it constituted a new and different offense and prejudiced its rights. The state first counters that the original indictment had a stand-alone paragraph at the end of the indictment, alleging that the conduct described in the various counts was "authorized, solicited, requested, commanded or knowingly tolerated by the board of directors or by a high managerial agent." Thus, the state argues, the original indictment, as well as the information, premised BRC's corporate liability on the actions of persons other than Rackers. BRC argues that the isolated paragraph referring to other agents of BRC was an improper incorporation by reference and not in compliance with Rule 23.01(d).

We do not resolve this issue because we hold that the information in lieu of indictment did not constitute the allegation of new or different offenses. The situation is akin to an amendment or substitution of a charging instrument that changes the allegation as to the means of perpetuation of the alleged crime. In such cases, our courts have held that an amendment does not necessarily charge a new offense. *State v. White*, 608 S.W.2d 134, 135–36 (Mo.App.1980) (change in method by which the offense of forgery was committed not a new offense); *State v. Taylor*, 651 S.W.2d 603, 605–06 (Mo.App.1983) (addition as to method by which offense of assault was committed was not a new offense). Here the effect of the substituted information was to change or actually expand the identity of the corporate agents whose acts expose the corporation to criminal responsibility. Our analysis is aided by asking whether the original indictment would have been insufficient as a matter of law if there had been no identification of "high managerial agent." If it would not have been, then the identity was mere surplusage and its modification did not constitute

the charging of a new or different offense. *Taylor*, 651 S.W.2d at 606. An indictment or information is sufficient if it states the essential elements of the offense in such manner that the defendant is adequately informed of the charge against him and disposition of the charge will constitute a bar to further prosecution for the same offense. *State v. Thomas*, 625 S.W.2d 115, 126 (Mo.1981). Considered together with our discussion of the other amendment, we hold that a change in the identification of the perpetuating corporate agent(s) where otherwise the offense and particulars remain the same is not the allegation of a different offense in violation of Rule 23.08.[5]

## Sufficiency of the Indictment and Information

BRC also contends the trial court erred in refusing to dismiss the Information for the failure of the charge to provide it specific notice of the nature of the criminal charge against it. More specifically, it argues that the Information was deficient because it did not include the specific identity of the agent(s) whose conduct was alleged to be binding upon the corporation. Our review of this claim is de novo as the dismissal of an indictment or information for failure to state an offense is a question of law. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

Section 562.056.1 provides for corporate criminal liability if "[t]he conduct constituting the offense is engaged in, authorized…or knowingly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation." A high managerial agent is defined by law as "an officer of a corporation or any other agent in a position of comparable authority with respect to the formulation of corporate policy or the supervision in a manage-

---

**5.** *See also, State v. Premier Service Corp.*, 765 S.W.2d 653, 658–59 (Mo.App.1989). There, a corporation was charged with a criminal offense. It asserted there was a fatal variance between the indictment charging the corporation was "acting with others" and the instruc-

tions which submitted that the corporation acted "through its agents." Noting that a corporation can only act through its agents and that "acting with others" was not an element of the crime charged, the language in the indictment was deemed mere surplusage.

rial capacity of subordinate employees." Section 562.056.3(2).[6]

BRC complains that the original indictment identified only Rackers as a high managerial agent and that the Information in Lieu of Indictment expanded that identification to include multiple unidentified agents. The state again counters that the stand-alone paragraph discussed earlier made reference to agents other than Rackers, albeit unidentified. BRC claims that without the specific identification of its corporate agents, the Information fails to inform it of the "nature and cause of the accusation" so that it could prepare an adequate defense and plead former jeopardy in the event of an acquittal. BRC also claims this result is demanded by the requirement that an information ". . . [s]tate plainly, concisely, and definitely the essential facts constituting the offense charged." Rule 23.01(2). Neither party points to any authority discussing whether a charge of corporate liability must include, as an element of the offense or essential fact for pleading purposes, the specific identification of the corporate agent.

█ We do not agree that the information is deficient in this regard. Following the filing of the Information in Lieu of Indictment, the state, in response to BRC's request for a bill of particulars, identified, in addition to Rackers, three other employees as "high managerial agents."[7] Not every lack of detail renders the Information deficient. The requirement that the charge *concisely* state the *essential facts* was satisfied by the allegation in the language of the statute that high managerial agents of BRC neglected certain residents of its nursing home. Rule 23.04 contemplates that an indictment or information may be sufficient but still not include sufficient particulars to enable the defendant to prepare his de-

fense. For jeopardy purposes, the court may look beyond just the indictment or information to protect the defendant's rights. "As far as double jeopardy is concerned, the present rule is that the entire record of the proceedings, and not the information alone, may be looked to if there is a claim of double jeopardy, and this defendant required no additional specificity to protect him from double jeopardy." *State v. Stigall,* 700 S.W.2d 851, 855 (Mo.App.1985). The identification of a corporate agent is not a specific element of the offense as set forth in § 198.070. BRC received particular information about the claimed corporate agents in the bill of particulars and we can see no prejudice, constitutional or otherwise, by the failure to specifically identify them in the Information. See Rule 23.11.

█ Both BRC and Rackers further contend that the Information was defective and should have been dismissed because it did not specify the "services, items or supplies" that they allegedly failed to provide the two nursing home residents. We review this claim under the same standard and for compliance with the same requirements discussed above. Both defendants cite *State v. Dale,* 775 S.W.2d 126, 132 (Mo. banc 1989), for the proposition that an insufficient information cannot be cured by the provision of a bill of particulars. That general statement is certainly correct. *Dale* is far more applicable than by just that general principle. *Dale* involved a prosecution under the same statute upon which these charges against BRC and Rackers is based. The owners and operators of a nursing home were charged with neglect of certain residents. They contended first that §§ 198.006 and 198.070(11) were unconstitutionally vague. The court rejected that

---

6. BRC does not contend that any of its employees as discussed herein were not "high managerial agents."

7. There were a series of hearings on BRC's motion to dismiss and renewed motions to

dismiss on this ground. At various times, the state identified various but not always identical high managing agents. The state also filed an amended bill of particulars just before trial.

argument and found that the prohibition of knowing abuse and neglect was sufficient to advise what must be done or avoided to be free of criminal liability. *Id.* at 129. The owners of the nursing home also claimed, as BRC and Rackers do here, that the indictment failed to state an offense. The *Dale* court acknowledged that an indictment, even in the language of the statute, was not sufficient if the statute uses only generic terms which might be applied to numerous fact situations. *Dale,* 775 S.W.2d at 132 (citing *State v. Kesterson,* 403 S.W.2d 606 (Mo.1966)).[8] *Dale* then noted that *Kesterson* was later distinguished after the legislature adopted a definition of deceit. *Id.; State v. O'Connell,* 726 S.W.2d 742 (Mo. banc 1987). *Dale* held that the statute, "reinforced by the definition" no longer required further particularization of the element of deceit. *Id.* at 132. Following these principles, the *Dale* court held that the inclusion in § 198.006(11) of a definition of neglect made unnecessary an allegation in the indictment of specific language particularizing the neglect. It was held therefore that an "information or indictment essentially in the language of the statute was sufficient." *Id.* at 132. In fact, the Information language specifying neglect by failure to provide services, items and supplies was far more detailed than approved by the Supreme Court in *Dale.*[9] The Information in Lieu of Indictment was sufficient as to both defendants.

### Sufficiency of the Evidence

In their next point, both BRC and Rackers argue that the evidence was not sufficient to support the convictions. In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the state. *State v. Peoples,* 962 S.W.2d 921, 924 (Mo.App.1998).

We give the state the benefit of all favorable inferences reasonably derived from the evidence and disregard all contrary evidence and any unfavorable inferences. *State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995). "It is not the appellate court's function to substitute its judgment for that of the jury." *State v. Zimmerman,* 886 S.W.2d 684, 691 (Mo.App.1994). Our obligation is to determine whether there is sufficient evidence upon which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* The state must establish every element of the offense by substantial evidence. *Dale,* 775 S.W.2d at 133. Substantial evidence is competent evidence from which the jury can reasonably decide the case. *Breckenridge v. Meierhoffer–Fleeman Funeral Home, Inc.,* 941 S.W.2d 609, 611 (Mo.App. 1997).

Both defendants are charged with knowingly neglecting a nursing home resident in violation of § 198.070(11). Neglect for purposes of the offense is defined as:

> [T]he failure to provide, by those responsible for the care, custody and control of a resident in a facility, the services which are reasonable and necessary to maintain the physical and mental health of the resident, when such failure presents either an imminent danger to the health, safety or welfare of the resident or a substantial probability that death or serious physical harm would result.

A person acts knowingly when the person is aware of the nature of his conduct or that his conduct is practically certain to cause a particular result. Section 562.016.3. A corporation may be held criminally responsible if, in the context of this statute, the conduct constituting the offense engaged in was authorized or

---

**8.** In *Kesterson,* the statute punished "stealing by deceit" but the term deceit was not defined. Therefore, the indictment was held to require the setting forth of the conduct causing the deceit.

**9.** Although the defendants in *Dale* were the owners and operators of the nursing facility their criminal responsibility was based on their individual conduct and not on any theory of derivative liability. 775 S.W.2d at 133.

knowingly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment. Section 562.056.

Both defendants argue that the evidence would not permit a reasonable juror to conclude that either's actions were "practically certain" to cause an imminent danger to the health, safety or welfare of either facility resident. Thus, they contend there was insufficient evidence from which a reasonable juror could have concluded beyond a reasonable doubt that either defendant acted knowingly.

### Evidence as to Patrick Rackers

Expanding on his argument, Rackers contends the evidence suffers from three deficiencies: (1) it fails to show that he knowingly failed to provide reasonable and necessary services to maintain the physical and mental health of Eva Sapp and Mary Johnson; (2) it fails to show that the first failure actually presented an imminent danger to the health, safety or welfare of the two residents; and (3) it fails to show that Rackers was aware that his conduct was practically certain to cause the imminent danger.

We initially consider the first two elements. A reasonable juror could have found beyond a reasonable doubt the following facts. Bed sores or decubitus ulcers can be prevented by turning patients regularly, keeping them dry, providing proper nutrition, and providing pressure relieving devices and other therapies such as whirlpools. The DOA regulates the operations of and level of care provided nursing home residents at BRC. Regulations promulgated by the DOA require that a resident who enters a home without pressure sores (decubitus ulcers) not develop pressure sores unless the resident's clinical condition demonstrates they were unavoidable. The regulation also describes what types of patients with particular underlying medical conditions are most at risk for the development of pressure sores. The regulation also sets out a staging system for grading the sores ranging (from low to high) from Stage I to Stage IV. Violation of the regulations with regard to pressure sores is a Class I violation which is a predicate for any criminal charge of neglect.[10] Rackers was familiar with these regulations. He knew it was his responsibility as the administrator to ensure that BRC provide reasonable services and supplies to avoid bed sores or treat bed sores that developed. He understood, despite his lack of medical training, that there were severe potential consequences to patients with pressure sores.

There was expert medical testimony that all Stage II sores present a risk of imminent danger to a patient. There was further expert testimony that the decubitus ulcers on Eva Sapp were avoidable and were the result of a failure to turn the patient regularly, keep her dry, provide proper nutrition and provide better pressure relieving devices (such as special beds or mattresses). There was evidence that particularly the second floor of BRC [11] was frequently understaffed through the spring and summer of 1995. As a result, staff was not able to turn immobile residents consistently on an every two-hour basis. There was a repetitive problem noted by BRC's consultant dietician and other staff with passing of snacks that bolstered nutrition and aided bed sore healing. Some staff made requests not only for more help but also for specialized mattresses for at least one of the residents involved here. One of the residents did not receive recommended whirlpool therapy. During the summer of 1995, there was an increasing rise in both the incidence and severity of pressure sores. Charting of such nursing services as patient turning, and measurement of intake and outflow was frequently incomplete. After the September 1995 hotline investigation and Class I complaint, some patient records were "updated" to

---

**10.** See *Dale,* 775 S.W.2d at 133.

**11.** This was where Sapp and Johnson resided.

record services supposedly provided much earlier.

■ Rackers makes numerous arguments as to why the evidence does not show neglect. He argues that BRC consistently met state staffing requirements and that three inspections during the summer of 1995 demonstrated this compliance. He acknowledges, however, that those staffing requirements were minimums and that the actual staffing needs could be higher, depending upon the condition and health needs of a particular nursing home's residents. He points out that a number of staff left BRC to go to another facility and that he was constantly advertising for and trying to find additional help. He also argues that nutritional needs were being met by other means than providing snacks, thus reducing the importance of failure to pass snacks to residents. He argues he bought a new whirlpool and the home had egg crate mattresses and some air mattresses that had long been used in the industry for pressure relief. He contends that just because nursing activities were not charted that does not prove that they were not done. Suffice it to say that the evidence was hotly contested over a trial lasting ten days. The credibility of the evidence is for the jury. *State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990). The weight of the evidence is also for the jury. *State v. Kinder*, 942 S.W.2d 313, 327 (Mo. banc 1996). We find there was sufficient evidence to prove "neglect" under the statute and that the two residents were in imminent danger to their health, safety and welfare. We also believe there was sufficient evidence for the jury to have found that Rackers knew of the dangers potentially presented by bed sores and that he well understood the potential danger to at risk patients from inadequate staffing, nutrition, turning, pressure relieving devices, and other treatments.

Rackers most strenuously argues that even if the above be true, he did not himself know about the particular conditions of Eva Sapp and Mary Johnson and, more particularly, did not knowingly fail to provide them with reasonable and necessary services and supplies. He argues that he does not have medical training and is dependent and relies upon those who do. He correctly points out that, under *Dale*, he cannot be held criminally responsible just because he was the supervisor. *Dale*, however, itself dismissed the argument about lack of medical training where the administrator was given medical information by the staff he supervised. The evidence the jury could have believed about Rackers' knowledge in this case is as follows. Several staff members complained directly to Rackers about inadequate staffing and that it was interfering with patient care, including the ability to turn patients and pass snacks. Rackers told supervisors to keep staffing levels at the state minimum. He was directly asked about a special bed for Mary Johnson. A specific order for a special bed had been given by her doctor in February 1995. In response, Rackers said the bed was too expensive. In response to other requests for beds for other residents, he asked whether they were private pay or Medicaid. If the patient was on Medicaid he said BRC "could not afford it." He pushed for higher census counts, despite staffing problems, to increase cash flow for a new building project. He attended meetings and/or received reports which outlined mounting pressure sore problems, during the summer of 1995. He was told, either directly or by inclusion in reports, about Eva Sapp and Mary Johnson's problems and needs. Rackers argues that many of his cost control efforts were just prudent business practices. He denies many of the specific reports to him of problems related by some of the state's witnesses. Again, the weight and credibility of the evidence is for the jury. *Sumkowski*, 794 S.W.2d at 645; *Kinder*, 942 S.W.2d at 327.

### Sufficiency of the Evidence as to BRC

■ BRC is also guilty of neglect if "the conduct constituting the offense is

engaged in, authorized, solicited, requested, commanded or knowingly tolerated by the board of directors or by a *high managerial officer acting within the scope of his employment and in behalf of the corporation.*" Section 562.056.1(3). (emphasis added). If the evidence is deemed sufficient as to Rackers, there would be sufficient evidence to hold the corporation responsible. BRC does not argue otherwise. There is no issue whether Rackers was a high managerial agent acting in the course and scope of his employment. A high managerial agent is defined by statute as "an officer of a corporation or any other agent in a position of comparable authority with respect to the formulation of corporate policy or the supervision in a managerial capacity of subordinate employees." Section 562.056.3(2). The state also argues that the Director of Nursing was a "high managerial agent." We agree. BRC argues that there was no evidence that any alleged neglect by her was in the course and scope of her employment. The record is clear that any actions or inaction by the Director of Nursing were part of her regular job duties in supervising the staff care providers at BRC. That she was not authorized to "neglect" residents' medical needs is not the issue. Moreover, corporate criminal liability can be predicated on the combined knowledge and actions or inaction of several high managerial agents. Even had we not deemed the evidence sufficient as to Rackers individually, which we do not, we are convinced that the combined acts and knowledge of Rackers and the Nursing Director are more than sufficient to support the verdict against BRC. Because of this analysis, we do not need to consider whether the Board itself "knowingly tolerated" neglect.

### Admission of Expert Testimony

BRC and Rackers' next point on appeal is that the trial court erred in admitting expert testimony from the state's nurse investigator because she "did not possess the minimum qualifications necessary" as she "did not have sufficient experience with the subject matter." The

admission of expert testimony is within the discretion of the trial court. *Brown v. St. Mary's Health Center*, 713 S.W.2d 15, 18 (Mo.App.1986). Whether a witness meets the qualifications of an expert is in the discretion of the trial court and is reversible on appeal only for an abuse of discretion. *State v. Stevens*, 467 S.W.2d 10, 23 (Mo.1971). In appellants' original brief, it is difficult to determine whether they complain that certain subjects were beyond the scope of expert opinion by a nurse or whether their complaint is that this particular nurse was not qualified. In their reply brief, they specifically attack her lack of nursing home experience or specialized training in pressure sores or elderly care. We must therefore consider her particular training and experience, the specific opinion questions asked of her, and the objections made to the trial court. We also will consider only those questions and objections that are specifically addressed in appellants' brief.

The first objection was to an opinion about whether Eva Sapp received necessary basic care services such as turning, feeding and moving. The next objection was as to the same question regarding Mary Johnson. The third specified objection was to a question as to the cause of death of the two residents. Our review of the record indicates that the last objection was effectively sustained by the court's direction to the jury to disregard the witness' answer. Rackers and BRC make no argument and we can discern no basis for an argument that the court should have taken any additional action. We will therefore consider only the first two objections.

No reason was stated on the record for the objections at issue except for a reference to the reasons stated in a motion in limine that the court had taken under advisement. Two grounds were stated in the motion. First, that the nurse investigator was biased because she worked for the state and was part of the prosecution team, and second, that she was unqualified because of a lack of adequate or recent experience in the area of elderly care or of

decubitus ulcers. Patricia Forck, the investigator, was a registered nurse who worked in the attorney general's office. She had been a registered nurse for 35 years and had worked 14 years as a staff nurse in hospitals; she had prior experience, admittedly more than 15 years ago, as a staff nurse and Director of Nursing in a long term care facility. For the past 14 years, she had worked either as a Medicaid fraud investigator or for the attorney general's office. The only two preserved objections deal with questions that are obviously directed to her experience in nursing care in hospitals and nursing homes.

■■■■ The recency of the witness' experience and training goes to the weight and value of her testimony and not to the qualifications. The court did not abuse its discretion in overruling the two described objections. In the argument portion of their brief, Rackers and BRC raise other points concerning other testimony by Forck, including her bias and whether certain opinions were proper subject matter for a nurse. We do not consider arguments not referred to in a point on appeal or not properly preserved. *State v. Karr,* 968 S.W.2d 712, 717 (Mo.App.1998). The brief, moreover points us to no specific objection in the record. We will not seine the record looking independently for alleged error. We have *ex gratia* reviewed the witness' testimony and find no plain or prejudicial error.

### BRC Immunity

■■■ BRC finally argues that it was not subject to criminal responsibility on the basis of statutory immunity, because it is a "quasi-governmental entity" operated by the State through Boone County. In support, it notes that Section 198.012 provides, in relevant part, that "[t]he provisions of sections 198.003 to 198.136 shall not apply to any of the following entities: (1) Any hospital, facility or other entity operated by the state or the United States...."

BRC argues that Boone County is a political subdivision of the State of Missouri, Mo. Const., art 6, sec. 1. The land and building of the nursing home are owned by Boone County, which originally established the facility as a home for indigent county residents. BRC is also classified as a tax exempt, county sponsored organization under 26 U.S.C. Section 115, exempting it from income taxes. Its employees are apparently covered by a pension plan established by the tax code for governmental organizations. BRC is a not for profit corporation. Its articles of incorporation require a member of the Boone County Commission to serve on its board of directors. In the past, the county has issued general bond issues for the benefit of the nursing home. Therefore, it argues, BRC is operated by the State through Boone County. We disagree.

As the State points out, BRC's operations are controlled, as with other corporations, by a board of directors and not by the county government. Moreover, under general rules of statutory construction, BRC would not be protected because 198.012 does not extend its exemption to political subdivisions of the state, such as a county. Finally, we note that if BRC's argument is correct, then it is not only protected from criminal liability under 198.070(11) but would also be exempt from the licensing and regulatory requirements of the Omnibus Nursing Home Act set forth in Chapter 198. BRC does not claim that it is not licensed under Chapter 198 or that it is not required to be so licensed.[12] It admitted in oral argument of its motion to dismiss before the trial court that it was subject to the licensure requirements but exempt only from the criminal neglect provisions. BRC does not explain how the statutory language quoted above justifies that distinction and does not address the issue at all in its brief.

Although the record is scant, we infer that BRC was at one time a "county nurs-

---

**12.** Arguably, if BRC was exempt, then so was Rackers as his liability is based on his actions as an employee of a licensed facility. Such an argument was raised before the trial court but is not made by Rackers on appeal.

ing home" as defined in § 205.375. It is also inferable that the county has leased the home to BRC as a not for profit corporation pursuant to § 205.375(4). The definition of a county nursing home cross-references the definition in § 198.006. We do not believe that we need to determine whether Boone County is the equivalent of "the state" for purposes of the exemption provided by § 198.012. Nevertheless, we observe that "county hospitals" are subject to the licensing and regulatory requirements established under § 197.020, *et seq.* We believe it is clear that in this case not even the county, let alone the state, operated the nursing home. BRC cites no authority or rationale and we can find none that would justify extending any protection provided by the state (or even a political subdivision) to a private corporation who is, as expressed by the County Commissioner member of BRC's board, a "tenant" of Boone County.

The convictions are affirmed.

All concur.