STATE of Missouri, Plaintiff–
Respondent,

v.

COMMUNITY ALTERNATIVES MIS-
SOURI, INC., d/b/a Turtle Creek
Group Home, Defendant–Appellant.

No. 28046.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 25, 2008.

Motion for Rehearing or Transfer to
Supreme Court Denied Sept. 16, 2008.

Application for Transfer Denied
Nov. 25, 2008.

Stephen L. Hill, Jr., Maxwell Carr–Howard, Blackwell, Sanders, Peper Martin LLP, Kansas City, Scott A. Lipke, Jones & Demund, L.C., Cape Girardeau, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, for respondent.

JOHN E. PARRISH, Presiding Judge.

Community Alternatives Missouri, Inc., d/b/a Turtle Creek Group Home, (defendant) was convicted of resident neglect following a jury trial.[1] §§ 562.056 [2] and 630.155. This court affirms.

---

**1.** Defendant was charged with and found not guilty of a separate count of involuntary manslaughter in the first degree. § 565.024.

**2.** References to statutes are to RSMo 2000.

## I. *Criminal Charge*

The information alleged that defendant committed the Class D felony of resident neglect. It charged that employees of defendant, "on or about between November 28, 2001, and January 10, 2002, . . . neglected Gary Oheim, a resident of a residential facility licensed by the Missouri Department of Mental Health, by failing to provide the services which were reasonable and necessary to maintain the physical and mental health of said Gary Oheim, which presented an imminent danger to the health, safety or welfare of said Gary Oheim." The information charged "that under Section 562.056.1(3), RSMo, Mary Collura engaged in and knowingly tolerated the conduct constituting this offense as a high managerial agent of the defendant and acted within the scope of her employment and in behalf of defendant."

## II. *Facts*

Defendant is certified by the Missouri Department of Mental Health to provide services to persons who are developmentally disabled or mentally retarded. Defendant is licensed to provide individualized supported living services, residential habilitation services, and day habilitation services. Defendant's responsibilities include providing basic health and safety assurances to its residents.

### A. *Organization and Business Structure*

Defendant is a corporation. Defendant's management chain includes a chief executive officer, regional vice presidents, and regional directors. Defendant operates more than 30 group homes, including Turtle Creek Group Home at Bolivar, Missouri (Turtle Creek). Its management chain for the operation of the group homes is divided into three divisions—North,

Central, and South. Each division is headed by an executive director, an associate director, and a program coordinator. Turtle Creek is part of defendant's South division. Amy Follis was executive director of that division, Diane Bickham was associate director, and Lisa Martin was program coordinator.[3]

Mary Collura was lead staff person for two of the group homes in the South division, Turtle Creek and Forest Ridge. Lead staff person is a management position. Collura was entrusted with the care, safety, health, and well-being of the residents of Turtle Creek. Collura's responsibilities included managing residents' medical care and supervising the staffs at Turtle Creek and Forest Ridge. Collura attended management meetings with Diane Bickham. She also performed training for the direct support staff for multiple homes within the South division. She gave job evaluations, disciplined support staff, and had authority to write checks on residents' accounts to buy personal items for them. She was provided a company credit card for use in purchasing supplies.

Mary Collura had authority to take residents to the doctor when necessary. She was responsible for getting residents to their appointments on time and for maintaining residents' prescriptions and refills. Her duties included ensuring that residents' medical care was properly documented and relaying medical information regarding residents to case managers with the Department of Mental Health.

### B. *Care of Gary Oheim*

Gary Oheim was a resident of Turtle Creek from February 2001 until his death on January 30, 2002. He was mentally retarded and suffered from cerebral palsy. He was confined to a wheel chair. He

---

**3.** Amy Follis supervised operation of "thirteen different homes."

could not move himself. He had to be repositioned often to prevent bedsores from developing.

Oheim was taken to the Associates of Medicine Clinic (the clinic), where Joe Follis was a nurse practitioner, for treatment on October 22, 2001.[4] Patty Price, an aide at Turtle Creek, attended the visit with Oheim. A nurse at the clinic documented a Stage I decubitus ulcer—the technical term for a pressure sore or bedsore—on Oheim's right knee and right hip. Turtle Creek staff was instructed to change Oheim's position frequently and to return him for re-evaluation October 26.

Johanna Brothers is a nurse who was employed by defendant to review medical documentation. Collura asked her to look at Oheim's right hip to determine if it was "out of place." Ms. Brothers observed a dime-sized bedsore on Oheim's hip. She brought it to the attention of Collura and instructed her to inform Oheim's doctors about the bedsore at Oheim's next appointment.

Oheim was taken to the clinic on October 30 and seen by Joe Follis; however, Follis did not perform a full body examination and did not see the sores on Oheim's body. Follis next saw Oheim on November 6. Follis diagnosed Oheim with a swelling of the right lower extremity and an ulcer of the right hip and coccyx, basically the tail bone. Treatment was prescribed and instructions given for Oheim to be brought back to the clinic in two weeks for re-evaluation.

On November 8, Oheim's legal guardian attended a quarterly meeting at Turtle Creek regarding Oheim's care. The sores

Oheim was experiencing were not mentioned at the meeting.

Joe Follis examined Oheim again on November 28. His examination notes state that the ulcers were improved and directed that the same treatment be continued. He instructed that Oheim be brought back for a check-up in one month or sooner if problems developed. However, Oheim was not seen again by Follis or by any other outside medical personnel between November 28, 2001, and January 5, 2002.

Oheim was brought to the clinic on January 5, 2002. He was again seen by Joe Follis. Ms. Collura was also present. Follis asked to see Oheim's hip and asked Collura to lean Oheim forward in his wheelchair, but Collura told Follis that was not necessary. Collura leaned Oheim to the side while he remained seated in the wheelchair. Joe Follis examined Oheim in the wheelchair while Oheim remained fully clothed. Follis testified that he should have known Oheim had bedsores and should have examined for them; that had he done so he would have known Oheim's sores were worsening.

Patty Price was present for Mr. Oheim's January 5 appointment. Price verified that Collura did not show Oheim's buttocks to Follis while Price was in the room with them. Price asked Follis if Oheim needed medicine and was told that he did not.

On January 9, Oheim was taken to the clinic again and seen by Joe Follis. Follis performed a full body examination of Oheim. Oheim was diagnosed with a Stage IV ulcer on his left buttock, a Stage II to III ulcer on his right hip, a Stage I ulcer on his left hip and right ankle, and a staph infection on his left buttock.[5] The

---

4. Joe Follis is the husband of Amy Follis, Executive Director of Community Alternatives South.

5. Evidence was adduced that there are four levels of bedsores. Stage I is the least serious; Stage IV the most serious. Stage I would generally appear as a general redness usually

tissue around the ulcer on the left buttock was described as necrotic—it had turned black and blue colored and emitted a bad odor.

Follis consulted Dr. Zolkowski, the clinic's consulting physician, regarding treatment. A culture was taken to see what type of bacteria was present in the wound and a prophylactic antibiotic prescribed pending that determination. An appointment was made with a plastic surgeon, Dr. Reynolds, for January 11. The treatment that was prescribed in the meantime was to frequently turn Mr. Oheim and keep the wound clean and dry. Oheim was returned to Turtle Creek pending his appointment with Dr. Reynolds.

Mr. Oheim was admitted to the hospital on January 10. Dr. Reynolds performed a procedure to treat his sores. Dr. Reynolds also consulted a general surgeon, Dr. Milholen, and requested that she perform a colostomy on Oheim. Dr. Milholen explained that Dr. Reynolds was concerned about the ability of the sores to heal; that one of the sores was constantly contaminated by feces due to the sore's location. Dr. Reynolds thought a colostomy would help the problem.[6]

Dr. Milholen, as a general surgeon, had experience treating ulcers. She testified that the colostomy was a necessary surgery to heal the ulcers. She examined Mr. Oheim on January 14 and performed the surgery January 15. She stated it was initially successful. However, she was called at 11:00 p.m. that night and told that Mr. Oheim was having serious complications. He had been removed from anti-seizure medication he was taking before

the surgery because the oral medication would conflict with requirements for surgery. When Dr. Milholen returned to the hospital, she found that Oheim had experienced a seizure and had herniated several loops of his small intestine into the colostomy bag. Dr. Milholen performed a second surgery in the late evening January 15 and early morning January 16 to repair the herniated intestine.

Mr. Oheim died January 30. An autopsy was performed. The physician who performed the autopsy, Dr. Shelley, testified that colostomy was a necessary and standard procedure to heal Oheim's ulcers due to their location. He concluded that Oheim died of complications of medical problems including the large ulcers, an infected gallbladder, and a necrotic bowel. Dr. Shelley believed the gallstones were a preexisting problem. It was his opinion that the necrotic bowel was likely caused by infection associated with the ulcers. Dr. Shelley's opinion was that the bedsores were the precipitating event leading to Mr. Oheim's death; that had Mr. Oheim not had the deep sores, he would have lived longer.

Another physician, Dr. Whitt, testified and stated the opinion that Mr. Oheim died of complications from the treatment of his ulcers.

### C. Other Witnesses

Patty Price testified that she thought Gary Oheim's sores had healed by late November because the skin had healed over them. She later learned that the sores were not healed; that they "tunneled" under the surface of the skin. She

---

over a bony prominence like the hip or knee. With a Stage II ulcer, the skin breaks like a blister. Stage III involves tissue damage. In Stage IV there is deep tissue damage, sometimes all the way to the bone.

6. The explanation was given that a colostomy involves cutting the colon and diverting it outside the body through the abdomen so that feces are collected in a bag rather than being excreted in the normal way.

learned this after Oheim was taken to the hospital and defendant's staff received training about how this type of ulcer could "tunnel." Ms. Price recalled seeing red areas on Mr. Oheim's bottom as early as September. In early December she became aware that the sores were producing an odor. In an attempt to alleviate the odor, disinfectant was sprayed in Mr. Oheim's room. The window in the room was opened. Oheim's roommate was moved to another room. Ms. Price complained of the smell to Ms. Collura. Collura told Price that she (Collura) was taking Oheim to the doctor throughout December. Collura also said she was taking Oheim to physical therapy, which was not the case.

Heather Wilson began working at Turtle Creek October 26, 2001, as a support staff employee. She worked the night shift from 11:00 p.m. to 7:00 a.m. She observed Oheim's bed sores when she began working at Turtle Creek. She told the trial court and jury that the sores became worse during the month of November; that by December they were "pussing." At one point when she wiped the wound with a washcloth, pus "poured out." Oheim's sores worsened during the month of December. They became so large that one "took up his whole butt cheeks." When Oheim was seated on a bench by Turtle Creek staff to permit him to shower, he would scream and his sores would bleed onto the bench. Wilson eventually refused to tend to them because they smelled so bad.

Justina Taylor began working at Turtle Creek in November. She observed Oheim's sores. She observed that the sores enlarged throughout the month of December. She observed that they were "pussing" and testified that she was not trained to treat this type of wound. She stated that she did not receive training on how to reposition him.

Karen Burks testified that the sores worsened significantly in early December; that Oheim's left buttock cheek "caved in." Lynette Cox–Bourisaw saw the wounds worsen in December. The skin around the opening of the sores turned black and hard and the wound became deeper and larger. Another employee, Sheryl Henderson, said the sores broke open in November and continued to get larger in early December.

Several of defendant's employees told of confronting Collura concerning Mr. Oheim's care. Ms. Cox–Bourisaw was dispensing medicine to Oheim in December and observed he was not receiving antibiotics or pain medication. She suggested that Ms. Collura get a second medical opinion. Ms. Cox–Bourisaw was told by Collura that Oheim had been going to the doctor for a long time; to do what she was told.

Ms. Burks wrote up incident reports that Collura was supposed to turn in to defendant's main office. When she would question if this had been done, Collura would tell her it was being taken care of. Ms. Burks told the trial court and jury that she was told by the main office not to talk to the doctors. She was told this was not within her job duties.

In December Mary Collura told Patty Price that an appointment was made for Mr. Oheim with Dr. Reynolds, a skin doctor. When Collura was questioned about Oheim's condition, she was told he was being taken to the doctor. Price saw Collura tear up an incident report written by another aide. Collura said the incident report was written improperly because it said that peroxide had been applied to Oheim's sore when that had not been ordered by the doctor. Other personnel saw Collura tear up incident reports regarding Oheim's sores.

Heather Wilson told Ms. Collura that she thought Oheim should be taken to an emergency room for treatment of his sores. Collura responded by telling Wilson to "mind [her] own f-ing business." Finally, Ms. Wilson filed an incident report noting her observations of Oheim's wound. She did so to protect herself from reprimand because she had not received training on how to treat bedsores and did not know what else to do. In late December or early January, Collura gave the Turtle Creek staff a "strict warning" to not say anything to the office about what went on in the house.

Michelle Nimmo Briggs began working at Turtle Creek sometime in January. On her second night at work she was shown Oheim's sores by another aide who was training her. She testified she had "never seen anything like [it] before;" that the wound was deep enough that she could see Oheim's tailbone. Briggs said the aide who was training her attempted to put peroxide on the wound, but Briggs told her that was not right. The next day Ms. Briggs tried to call the management office to talk to Amy Follis, but was told Ms. Follis was not in the office.

Ms. Briggs went to the office to talk to Amy Follis. Ms. Follis was still unavailable. Ms. Briggs spoke with Lisa Martin. Briggs told Martin that she needed to go to Turtle Creek immediately and do something about Oheim. Martin told Briggs she would talk to the home's manager, Mary Collura. The two argued but Martin asserted she would talk to Collura. Briggs said she would call the state police herself and left.

Amy Follis left a message on Briggs' answering machine; then at some point, the two talked. Ms. Follis testified that she told Diane Bickham to have someone go to Turtle Creek to take Oheim to a doctor. She also called the Missouri Department of Mental Health and reported the situation.

### D. Response by Missouri Department of Mental Health

Ann Woody was employed by the Missouri Department of Health. She conducted abuse and neglect investigations. Ms. Woody received a call from Amy Follis on January 9. Ms. Follis reported that Oheim had bedsores that should be looked at, but did not tell Woody how serious the wounds were or that the situation was urgent. Woody visited Turtle Creek January 10 to investigate.

The first thing Ann Woody noticed when she entered Oheim's room was an overpowering smell that she later learned was gangrene. She was shocked—she had never seen anything as bad as his case. There was an oval shaped ulcer on Oheim's buttocks which was eaten away almost to the bone and looked large enough to put her fist in. Her opinion was that Oheim had been neglected; that if the medical advice Collura had received was not producing results, Collura should have taken Oheim to another doctor or to an emergency room rather than continuing the treatment throughout December.

Woody learned that aides at Turtle Creek had reported Oheim's condition to Collura; that Collura would tell them Oheim was being taken to the doctor. The aides informed Woody that Collura had torn up written incident reports. Woody wanted to talk to Collura but was told Collura was on vacation. Mary Collura never returned to work.

### III. Defendant's Appeal

■ Defendant's first point on appeal asserts that "[t]he trial court erred in exercising subject matter jurisdiction over [defendant];" that "jurisdictional elements

required under Missouri Revised Statute § 562.056 were not met." Point I then claims that factual requirements were not proven that § 562.056.1(3) requires in order to impose criminal liability on a corporation, essentially the same assertion that is set forth in Point III. The claim of lack of evidence to support the factual allegations will be addressed in determining Point III.

Section 562.056.1(3) states:

A corporation is guilty of an offense if

. . .

(3) The conduct constituting the offense is engaged in, authorized, solicited, requested, commanded or knowingly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation.

■■■ Defendant's claim that the requirements of § 562.056.1(3) are "jurisdictional" is incorrect. Section 562.056.1 does not affect circuit court subject-matter jurisdiction. Rather, the statute prescribes acts, in addition to those stated in particular criminal statutes, that must be proven in order to hold a corporation criminally liable. "Subject-matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong." *State ex rel. Moore v. Sharp,* 151 S.W.3d 104, 112 (Mo.App.2004) (Bates, C.J., concurring). The trial courts of this state, the circuit courts, "have original jurisdiction over all cases and matters, civil and criminal." § 478.070. The information on which this case was tried, the First Amended Information, charged defendant with the criminal offense of resident neglect. The trial court had authority to hear and determine that charge. Point I is denied as to its assertion directed to the subject-matter jurisdiction of the trial court.

■■ Point II is directed to the trial court's refusal to give a jury instruction tendered by defendant. It argues that the trial court erred in refusing to give an MAI instruction on "scope of employment;" that the instruction addressed a critical issue regarding establishment of defendant's guilt.

Rule 30.06 addresses the requirements for appellant's briefs in criminal cases. Rule 30.06(a) provides that the brief shall contain the material prescribed by Rule 84.04(a). Rule 30.06(c) specifically states that the argument shall be prepared as provided by Rule 84.04. Rule 84.04(e) states, "If a point relates to the giving, refusal or modification of an instruction, such instruction shall be set forth in full in the argument portion of the brief."

The proposed instruction that was refused and which is the subject of Point II is not set forth in the argument portion of defendant's appellant's brief. The alleged error was not preserved for appellate review. *Mitchem v. Gabbert,* 31 S.W.3d 538, 541 (Mo.App.2000); *Stewart v. Kirkland,* 929 S.W.2d 321, 322 (Mo.App.1996). Point II is denied.

■■ Point III asserts that "[t]he trial court erred in sustaining the jury's verdict against [defendant]" because there was not sufficient evidence from which the jury could reasonably find that Mary Collura was a high managerial agent of defendant acting within the scope of her employment and that she neglected Gary Oheim.

In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the state. *State v. Peoples,* 962 S.W.2d 921, 924 (Mo.App. 1998). We give the state the benefit of all favorable inferences reasonably derived from the evidence and disregard all contrary evidence and any unfavorable inferences. *State v. Silvey,* 894

S.W.2d 662, 673 (Mo.banc 1995). "It is not the appellate court's function to substitute its judgment for that of the jury." *State v. Zimmerman*, 886 S.W.2d 684, 691 (Mo.App.1994). Our obligation is to determine whether there is sufficient evidence upon which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* The state must establish every element of the offense by substantial evidence. *[State v.] Dale*, 775 S.W.2d [126] at 133 [ (Mo.banc 1989) ]. Substantial evidence is competent evidence from which the jury can reasonably decide the case. *Breckenridge v. Meierhoffer–Fleeman Funeral Home, Inc.*, 941 S.W.2d 609, 611 (Mo.App.1997).

*State v. Boone Retirement Center, Inc.*, 26 S.W.3d 265, 272 (Mo.App.2000).

Defendant was convicted of resident neglect. The elements of that offense are established by § 630.155.1. It states, as applicable here:

A person commits the crime of "... **resident ... neglect**" against ... any patient, resident or client of any residential facility ... operated, funded or licensed by the department[ [7] ] if he knowingly does any of the following:

. . .

(4) Fails to provide services which are reasonable and necessary to maintain the physical and mental health of any person, patient, resident or client when such failure presents either an imminent danger to the health, safety or welfare of the person, patient, resident or client or a substantial probability that death or serious physical harm will result.[ [8] ]

The offense of which defendant was found guilty, as established by § 630.155.1(4), is a class D felony. *See* § 630.155.2.

As was noted in disposing of Point I, § 562.056.1(3) establishes additional elements required to find a corporation guilty of the criminal offense of resident neglect. For defendant, a corporation, to be guilty of that offense, the conduct that constituted the offense must have been "engaged in, authorized, solicited, requested, commanded or knowingly tolerated ... by a high managerial agent acting within the scope of his employment and in behalf of the corporation."

Without copies of the jury instructions, *see* n. 8, *supra*, this court is left to speculate as to the directive given to the jury in this regard. The amended information alleged, however, that Gary Oheim, a resident of a residential facility, licensed by the Missouri Department of Mental Health, was knowingly neglected; that he was not provided "the services which were reasonable and necessary to maintain the physical and mental health of said Gary Oheim, which presented an imminent danger to the health, safety or welfare of said Gary Oheim, and that under Section 562.056.1(3), RSMo, Mary Collura engaged

---

**7.** The department is "the department of mental health of the state of Missouri." § 630.005(8).

**8.** The legal file component of the record on appeal does not include copies of the jury instructions given at trial notwithstanding the directive that the legal file "contain clearly reproduced exact copies of ... portions of the trial record previously reduced to written form." Rule 81.12(a). Defendant did include in the appendix to its appellant's brief what it represents to be copies of two of the trial court's jury instructions. They do not appear to be exact copies of instructions in that they are not in the usual form of instructions used by trial courts. Similarly, they are not certified as would be required for copies of instructions included in a legal file. The requirements for what records on appeal are to include and for their certification serve legitimate purposes and should not be slighted.

in and knowingly tolerated the conduct constituting this offense as a high managerial agent of the defendant and acted within the scope of her employment and in behalf of the defendant." Point III takes issue only with whether there was sufficient proof that Mary Collura was a high managerial agent of defendant and that her actions were done in the course of her employment by defendant as required by § 562.056.1(3), and that, as such, she knowingly neglected Gary Oheim, § 630.155.1.

Defendant's argument regarding whether Mary Collura was a high managerial agent and whether the actions she took, or failed to take, occurred on behalf of defendant within the scope of her employment is directed to Ms. Collura's status in defendant's overall corporate structure. Defendant contends it cannot be held liable because Mary Collura lacked corporate-wide authority and lacked authority comparable to a corporate officer within that structure. Defendant contends that for those reasons, requirements imposed by § 562.056.1(3) to hold it criminally liable were not met.

■ Defendant's statement of facts, albeit with the argumentative subtitle, "Mary Collura Was a Low–Level Employee Lacking Management Authority," acknowledges that defendant operates multiple group homes.[9] Defendant operated "over thirty group homes throughout the State of Missouri." Its operating structure included three divisions designated as North, South, and Central. Turtle Creek was one of 13 group homes located within defendant's South division. Defendant contends that its overall size and operation must be considered in ascertaining Mary Collura's status for purposes of applying § 562.056.1(3).

The state contends that the applicability of § 562.056.1(3) is to be ascertained by examination of Mary Collura's role in the operation of the single group home that is the subject of this case, Turtle Creek. The state suggests that the definition of "high managerial agent" for purposes of determining corporate criminal liability per § 562.056.1(3) involves three circumstances; that for purposes of § 562.056, the term is defined by subsection 3(2) of that statute. The state suggests that the third circumstance the statute prescribes is applicable here; that, under the facts in this case, Mary Collura qualified as a high managerial agent for defendant for purposes of § 562.056; that although she was not designated as an officer of the corporation, the evidence was sufficient for the jury to find that Mary Collura supervised subordinate employees in a managerial capacity; that in that regard, Mary Collura was in a position of authority at Turtle Creek comparable to that of a corporate officer. This court agrees.

In ascertaining the meaning of a statute, this court interprets the meaning of the language used to determine the legislative intent to be ascribed to that language. *State v. Haskins*, 950 S.W.2d 613, 615 (Mo. App.1997). "[O]ur primary responsibility is to ascertain legislative intent from the language used, to give effect to that intent if possible, and to consider the words used in their ordinary meaning." *Id.*

Section 562.056.3 states:

As used in this section:

---

**9.** "Rule 84.04(c) requires that the statement of facts in a brief shall set forth 'a fair and concise statement of the facts relevant to the questions presented for determination *without argument.*'" *Rice v. State, Dept. of Social Services,* 971 S.W.2d 840, 841–42 (Mo.App.1998)

(emphasis added). The purpose of Rule 84.04(c) and the danger to which an appellant subjects itself in failing to observe the directives of that rule is discussed at length in *Vodicka v. Upjohn Co.,* 869 S.W.2d 258, 260–64 (Mo.App.1994).

(1) **"Agent"** means any director, officer or employee of a corporation ... or *any other person who is authorized to act in behalf of the corporation* ...;

(2) **"High managerial agent"** means an officer of a corporation or *any other agent in a position of comparable authority with respect to ... the supervision in a managerial capacity of subordinate employees.*

(Emphasis added.)

The plain language of the statute provides that a person authorized to act in behalf of a corporation who has managerial authority to supervise subordinate employees, comparable to a corporate officer, is, for purposes of § 562.056, a high managerial agent. Acts of persons who satisfy the definition of "high managerial agent" set forth in § 562.056.3(2) can subject a corporation to criminal liability notwithstanding that he or she is not a member of a corporate board of directors or is not a corporate officer. It is the function within a corporate structure that must be considered, not merely job titles.

A question this appeal presents is whether the definition of "high managerial agent" is to be applied differently with respect to corporations that operate numerous business units than to corporations that operate a single business unit. Is a corporation that operates numerous business units shielded from criminal liability when the same conduct would subject a corporation with a single business unit to criminal liability? This court thinks not.

In *State v. Boone Retirement Center, Inc., supra,* the corporate defendant was held criminally liable for mistreatment of nursing home residents tolerated by the corporation's administrator. The administrator was a managing official of a single residential facility who supervised subordinate employees who provided care for residents. Patients were neglected to the extent that they suffered serious physical disability—ulcers (bedsores) that contributed to the death of two patients. *Boone* held that the corporation was criminally liable, via § 562.056, by reason of combined acts of the administrator of the facility and its nursing director's combined knowledge and actions or inactions with respect to the neglect of the patients who died. *Boone,* 26 S.W.3d at 275.

In this case, defendant operated many facilities, or business units, under a single corporate ownership. Each business unit had personnel responsible for the care of the residents at its facility. This court does not perceive the legislative intent that fostered enactment of § 562.056 to have been to treat large corporations with numerous operating units different from those that operate a single or a few business units.

Here, as in *Boone,* an employee was responsible for supervising and managing the care of residents. In *Boone* the responsibility was that of the facility administrator and director of nursing. Here, the employee who had that responsibility was Mary Collura. Mary Collura had comparable responsibility at Turtle Creek with respect to Gary Oheim that the administrator and director of nursing had with respect to the residents at the single facility that was operated by Boone Retirement Center, Inc.

Mary Collura managed and supervised the employees responsible for providing patient care. She determined what medical care would be afforded Gary Oheim pursuant to the business structure prescribed by defendant. She was defendant's "lead staff person" at Turtle Creek. She supervised staff at Turtle Creek. The support staff at Turtle Creek responsible for direct care-giving to residents reported to Collura. Mary Collura gave job evalua-

tions, disciplined support staff through written reprimands, and made recommendations regarding hiring and firing of support staff.

Mary Collura had a company credit card for use in purchasing needed items such as food, cleaning supplies, and gasoline. She had authority to take residents to doctors when she believed it was necessary. She was responsible for getting residents to their appointments. No other authorization was required for her to obtain medical care for residents. Other evidence of Collura's supervisory responsibilities was directives given other staff members that they were not to talk to residents' doctors; that this was Collura's responsibility. At least one staff member testified she was told by defendant's "main office" not to talk to doctors because that was not her responsibility.

■ Collura was the only manager who was regularly present at Turtle Creek. There was evidence that Collura's corporate supervisor, Lisa Martin, visited Turtle Creek only about once a month, although Martin testified that she tried to visit Turtle Creek once a week. Collura's acts were undertaken pursuant to defendant's direction and authorization. As such, her activities and directives given others with respect to the care provided Gary Oheim were within the scope of her employment. Her actions were on behalf of defendant. They were done to further defendant's business or interest.[10]

There was sufficient evidence for the jury to have found that Mary Collura was authorized to act in behalf of defendant; that she had managerial responsibility pursuant to which she supervised subordinate employees. In the capacity in which she supervised subordinate employees, the evidence was sufficient to permit the jury to find Mary Collura was an agent in a position of comparable authority as an officer of the corporation. The evidence was likewise sufficient to prove that Mary Collura committed acts or knowingly tolerated conduct of others that presented an imminent danger to the health, safety, and welfare of Gary Oheim. Point III is denied.

■ Point IV contends "[t]he trial court erred by failing to invoke the doctrine of judicial estoppel, because the state's allegations against [defendant] should have been barred, in that they were inconsistent with the state's stipulation that nurse practitioner Follis, not [defendant], was responsible for Gary Oheim's death."[11] The state asserts that this claim was raised for the first time in defendant's motion for new trial; that, therefore, defendant did not preserve the claim attempted to be asserted in Point IV for appellate review; that if any consideration is given to Point IV, it would be a review for plain error.

Defendant, in its amended reply brief, contends otherwise. Defendant says it "raise[d] at trial the applicability of the doctrine of judicial estoppel to [the state's] prior stipulation in the Follis Agreement." Defendant states "206:18–212:17" as its

---

10. "If the act is fairly and naturally incident to the employer's business although mistakenly or ill advisedly done, and did not arise wholly from some external, independent or personal motive, it is done while engaged in the employer's business." *Noah v. Ziehl,* 759 S.W.2d 905, 910 (Mo.App.1988).

11. Point IV does not identify the stipulation to which it refers. The argument that follows Point IV indicates the intended "stipulation"

was "a binding disciplinary agreement" entered before the State Board of Healing Arts. The state's amended respondent's brief suggests the reference was to a settlement agreement between the State Board of Nursing and Joe Follis that was " 'for the purpose of resolving the question of whether [Follis]'s license as a registered professional nurse [would] be subject to discipline.' "

reference in support of its claim. This court has reviewed the trial transcript commencing at page 206, line 18 and continuing through page 212, line 17. The term "judicial estoppel" does not appear in that text; nor is a motion to dismiss or other objection made.

■ Regardless, Point IV does not identify a trial court ruling or action that is contended to be erroneous as required by Rule 84.04(d)(1)(A) and, therefore, preserves nothing for this court's review. A blanket challenge that does not identify a specific trial court ruling or action being challenged does not comply with Rule 84.04(d)(1)(A). *Roberson v. KMR Const., LLC,* 208 S.W.3d 320, 322 (Mo.App.2006). Point IV is denied.

■ Point V asserts that "[t]he trial court erred in permitting Mary Collura to testify at trial while dressed in prison garb"; that this affected the outcome of the trial because "the jury could infer that Mary Collura had been found guilty of the crimes charged and as a result that [defendant] was guilty as well."

■ The state argues that defendant did not preserve this matter for appellate review; that defendant failed to object to Collura's appearance when she testified. Defendant's reply brief contends it did object; that "[m]uch of this was off the record, but counsel did approach the bench just prior to her testimony." Defendant acknowledges that the transcript reflects "a bench conference"; that "[n]one of the words spoken appear in the record."

It is appellant's responsibility to provide the court with a transcript sufficient for consideration of his claims of error.

*State v. Borden,* 605 S.W.2d 88, 91–92 (Mo.banc 1980). "If the transcript is defective or omits material matters, it is appellant's duty to take steps to supply the omission or cure the defect." *State v. Brown,* 690 S.W.2d 161, 163 (Mo.App. 1985).

*Lassen v. State,* 717 S.W.2d 538, 539 (Mo. App.1986).

Without a record of the proceedings defendant contends occurred, defendant's claim of error is not reviewable on appeal. *State v. Cleveland,* 627 S.W.2d 600, 601 (Mo.1982). Point V is denied. The judgment is affirmed.

BATES, J., concurs.

SCOTT, J., concurs in separate opinion.

## OPINION CONCURRING IN PART AND IN RESULT

DANIEL E. SCOTT, Judge.

I agree with the court's opinion as to Points I, II, IV, and V. I also concur in the result despite some concern about the merits of Point III. Research has not settled my difficulties interpreting our "high managerial agent" (HMA) definition or applying it to this case, in which the State focuses on definitional language about supervising subordinate employees, while Defendant emphasizes the clause about authority comparable to a corporate officer. Given the dearth of Missouri authority,[1] I consulted outside sources to try to better understand Missouri's HMA text (which is not unique) and evaluate the competing arguments, but with little success.[2]

Defendant claims Ms. Collura's supervisory authority as lead person over two of

---

1. HMA status apparently was not truly contested in either Missouri case I found. *See State v. Barnes,* 245 S.W.3d 885, 887, 890, 891 (Mo.App.2008)(individual defendant Jeffery Barnes was president and sole owner of corporate defendant "Jeff Barnes, Inc.");

*State v. Boone Retirement Center, Inc.,* 26 S.W.3d 265, 271 n. 6 (Mo.App.2000)(HMA status expressly not at issue).

2. To briefly summarize that research, the Model Penal Code's HMA definition speaks of

its facilities was not comparable to that of its corporate officers. Corporate officers derive their authority from the by-laws or board resolutions. § 351.360.2. There is no suggestion of "inherent" officer authority vis-á-vis Missouri's HMA definition. This is not surprising since corporations range from one-man shows to multinational enterprises with thousands of branch locations. Even in the latter scenario, the flexibility of modern corporate laws and structures could enable "branch managers" to exercise authority comparable to that of a corporate officer, at least within their sphere of influence and with respect to their subordinate employees. To the extent a corporation authorized or permitted branch managers to so act, it would seem appropriate to impute corporate criminal responsibility arising from or relating to those actions.[3]

Thus, the principal opinion rightly notes that we must consider functions within a corporate structure, not merely job titles. It is on such matters that I believe Defendant has not carried its burden. Defendant seeks to distinguish Ms. Collura's supervisory authority from that of its corporate officers, without providing the by-laws or resolutions that establish or describe its officers' authority per § 351.360.2.[4] Defendant offered an organizational chart into evidence at trial, but has not provided that document either. Indeed, while the transcript references trial exhibits numbered into the hundreds—the organizational chart was admitted as Exhibit 728—no exhibits have been filed with this court. It was Defendant's "duty to file a complete record including all evidence necessary to determine all questions presented to this [c]ourt for review." *State v. Morin*, 873 S.W.2d 858, 867 (Mo.App.1994). Exhibits not produced in compliance with Rule 30.05 may, pursuant to that rule, be considered by the appellate court as immaterial to the issues on appeal. *Id.* See also *State v. McElvain*, 228 S.W.3d 592, 599 (Mo.App.2007). Also, without exhibits, we often have been reduced to speculating on the import of witness testimony about those exhibits and the Point III issues to which they were directed.

Nor are we sufficiently aided by the one-sided, argumentative statement of facts in Defendant's brief. It is unnecessary to recount the discussion, at oral argument, about this and other briefing deficiencies. The problem is that under these circumstances, and given our standard of review, we must become an advocate for Point III in order to adequately consider it. It is to ensure that appellate courts do not become advocates that Rule 84.04 exists and its briefing rules are mandatory. *Lueker v.*

officers or agents whose "conduct may fairly be assumed to represent the policy of the corporation," which approaches Defendant's implicit position in this case. But most states have opted for broader HMA definitions that specifically mention, in some respect, persons who manage or supervise employees. *See* Steven Walt and William S. Laufer, *Why Personhood Doesn't Matter: Corporate Criminal Liability and Sanctions*, 18 Am. J.Crim. L. 263, 268–69 (1991); Kathleen Brickey, *Rethinking Corporate Liability Under The Model Penal Code*, 19 Rutgers L.J. 593, 631 (1987). Although several states have HMA definitions similar to Missouri's, few reported cases are even arguably relevant to Point III, and none

particularly persuasive, since they are distinguishable, or lack analysis, or both.

3. That said, I reject the State's arguments to the extent they suggest that any manager who supervises subordinate employees could be deemed a HMA. I believe this interpretation could extend corporate criminal liability far beyond our legislature's intent.

4. That is not to say that such documents necessarily would be decisive or even persuasive in any given case. *See, e.g.*, the apparent (as opposed to inherent) authority and corporate acquiescence concepts described in *Rice v. Bol*, 116 S.W.3d 599, 608–09 (Mo.App.2003).

*Missouri Western State Univ.,* 241 S.W.3d 865, 867 (Mo.App.2008).

Could we seine over 1400 transcript pages, unaided by exhibits or proper briefing, in an attempt to evaluate Defendant's arguments and build a case for reversing as to Point III? Perhaps. But not only are we not so obliged; we are prohibited from doing so. "The adversarial process clearly defines and distinguishes the roles of advocates and judges. Judges must not be advocates but instead must be free to impartially evaluate the arguments of the parties." *Id.* (citations omitted). "An appellate court has no duty to search the transcript or record to discover the facts which substantiate a point on appeal. This court consistently has refused to become an advocate for one party in this fashion." *Nolan v. Degussa Admixtures, Inc.,* 246 S.W.3d 1, 3 (Mo.App.2008). Accordingly, I join Points I, II, IV, and V of the court's opinion and concur in the result.